OUTBOARD MARINE CORPORATION, Plaintiff-Appellant and Cross-Appellee, v. LIBERTY MUTUAL INSURANCE COMPANY *et al.*, Defendants-Appellees and Cross-Appellants.

Second District No. 2—95—0950

Opinion filed September 16, 1996.

Louis W. Brydges, Sr., and Leslie A. Peterson, both of Brydges, Riseborough, Peterson, Franke, & Morris, of Waukegan, Thomas W. Johnson, Jr., and Michael G. Ermer, both of Irell & Manella, of Newport Beach, California, and Richard J. Kissel, of Gardner, Carton & Douglas, of Chicago, for appellant.

Jay V. Krafsur, Jose A. Isasi II, and Robert N. Lane, all of Rivkin, Radler & Kremer, of Chicago, for appellee Employer's Surplus Lines Insurance Co.

James K. Horstman, Anthony P. Katauskas, and Lloyd E. Williams, Jr., all of Williams & Montgomery, Ltd., of Chicago, for appellee Home Insurance Company.

Shaun McParland Baldwin and Dawn Midkiff, both of Tressler, Soderstrom, Maloney & Priess, of Chicago, for appellee Northbrook Insurance Company.

John Y.E. Lee and Lisa C. Breen, both of Oppenheimer, Wolff & Donnelly, and Maria G. Enriquez, of Bates, Meckler, Bulger & Tilson, both of Chicago, for appellee American Re-Insurance Company.

James A. White, Karen Kazel Poulos, and Steven A. Wright, all of Jones, Day, Reavis & Pogue, and John H. Mathias, Jr., Stephanie A. Scharf, Gabrielle Sigel, John D. Shugrue, and Thomas A. Marrinson, all of Jenner &

Block, both of Chicago, and Lester O. Brown and Thomas M. Mcmahon, both of Jones, Day, Reavis & Pogue, of Los Angeles, California, for *amicus curiae.*

JUSTICE THOMAS delivered the opinion of the court:

This appeal involves an insurance coverage dispute between the plaintiff, Outboard Marine Corporation (OMC), and four of its excess insurance carriers, The Home Insurance Company (Home), Employer's Surplus Lines Insurance Company (ESLIC), Northbrook Insurance Company (Northbrook), and American Re-Insurance Company (American). Following a two-week bench trial on the issue of the insurers' duty to indemnify OMC, the circuit court of Lake County held that OMC's polychlorinated byphenyl (PCB) contamination of Waukegan Harbor constituted a "continuing occurrence" between 1953 and 1976 triggering coverage under the respective policies. The court entered judgment on behalf of OMC and against the above-mentioned insurers as follows: $3 million against ESLIC; $4.8 million against Home; and $300,000 against American. The trial court granted Northbrook's motion for partial summary judgment based on a noncumulation of the liability clause in its policy. OMC appeals from the trial court's judgment, and all four of the excess insurers cross-appeal.

## FACTS

OMC is a large manufacturer of outboard motors. Since the 1940s, OMC has operated a die-casting facility in Waukegan, Illinois, near Waukegan Harbor. From approximately 1953 through 1976, OMC's die-cast machines at plant No. 2 compressed molten aluminum at great pressure and extremely high temperatures into parts for outboard engines. OMC used a hydraulic fluid, Pydraul, in its die-casting process. Pydraul was manufactured by Monsanto Company (Monsanto) and contained PCBs. This PCB-laden effluent from OMC's facility was routed to a ditch on OMC's property known as the North Ditch and eventually found its way into Waukegan Harbor and Lake Michigan.

Periodically, Pydraul discharged from OMC's die-cast machines when hoses ruptured and leaks occurred. Some Pydraul was recovered through catch basins or absorbent materials on the plant floor. Pydraul was also flushed into trenches around the die-cast machines and routed to oil interceptors. The plant had two oil interceptors, one on the north end of the plant and the other on the south end of the plant. Pydraul that eventually ended up in Waukegan Harbor travelled to outfall 009 and entered the harbor at slip No. 3.

In 1960 OMC modified its wastewater treatment system by

installing baffles and two 300-gallon-per-minute pumps at the south oil interceptor and by installing a bypass system to divert water that had been processed in the south oil interceptor of the south end of the plant away from Waukegan Harbor and into the North Ditch. Around September 1967, OMC began sampling wastewater discharges at outfall 009, which was at or near the harbor. Sampling records from September 1967 through January 1972 did not show the presence of Pydraul in the water flowing to the Waukegan Harbor. However, at that time, OMC was not testing in a manner which was likely to disclose the presence of PCBs.

Early in 1968, OMC hired Betz Laboratories (Betz) to perform an environmental audit of OMC's facilities. OMC implemented Betz's recommendation that uncontaminated cooling water be diverted away from oil interceptors and be discharged directly to the North Ditch. During its audit, Betz noticed two or three peanut-sized globules of material along a four-foot section at the bottom of the outfall line, which it concluded consisted of Pydraul. Betz's work did not quantify any movement of these globules, although slow movement toward Waukegan Harbor was observed. While Betz detected noticeable pollution of the North Ditch, it did not observe any evidence of pollution in Waukegan Harbor, and it did not actually observe the direct discharge of any Pydraul into Waukegan Harbor.

Around October 1969, OMC approved a requisition for the installation of piping to remove the flow of uncontaminated hydraulic oil cooling water from the south oil interceptor and to direct this water from the die-cast machines directly to the south sump basin. In addition, the requisition included the replacement of the existing 300-gallon-per-minute sump pumps at the south end of the die-cast plant with two 700-gallon-per-minute sump pumps.

In November 1971, OMC approved a requisition for the installation of piping to remove the flow of contaminated die-cooling waters from the floor trench system in the die-cast building, so as to remove this cooling water from the north and south oil interceptors to be discharged directly into the North Ditch.

From 1953 through the end of 1970, the formulation of Pydraul purchased by OMC contained PCBs. OMC was not told or otherwise aware that Pydraul contained PCBs until it was notified by Monsanto of this fact by a letter dated December 29, 1970. Monsanto's letter noted that pollution laws, moral considerations, and the best interests of its customers were leading it to entirely exclude PCBs from its Pydraul products so that "any question of environmental contamination" would be eliminated. Although OMC stopped purchasing PCB-bearing formulations of Pydraul in 1970, it continued

to use the PCB-laden Pydraul that it had in stock. Furthermore, residual amounts of PCB-laden Pydraul remained in OMC's die-casting machines until approximately 1976.

## PROCEDURAL HISTORY

In February 1976, the United States Environmental Protection Agency (USEPA) notified OMC that it was in violation of various environmental statutes due to its discharge of PCBs into the Wauke-gan Harbor and the North Ditch of its property. In March 1978, the USEPA filed an action against OMC in the United States District Court for the Northern District of Illinois to compel remediation of the contaminated areas. Later that same year, the Illinois Environmental Protection Agency (IEPA) filed an action against OMC in the same federal court and based on the same factual allegations as in the USEPA complaint. In 1985, the governmental agencies were granted a voluntary dismissal of their complaints without prejudice. In 1988, the USEPA and the IEPA filed new complaints against OMC in federal court, alleging facts and praying for relief similar to that set forth in their initial complaints.

The present lawsuit originated in August 1986, when OMC filed suit against its primary insurance carriers, Liberty Mutual Insurance Company (Liberty), Commercial Union Insurance Company (Commercial) and Insurance Company of North America (INA), alleging a duty to defend and indemnify OMC in connection with the federal environmental litigation. Thereafter, various excess insurers, including those involved in the instant appeal, either intervened or were added as party defendants.

In April 1989, the district court approved and entered a consent decree which was negotiated and entered into by OMC and the governmental agencies. Pursuant to the consent decree, OMC was required to make payments into a trust fund for the cost associated with the cleanup of Waukegan Harbor. Prior to trial of the instant proceeding, the parties stipulated that OMC incurred $17.5 million in damages to comply with the consent decree and to remediate the harbor.

In the aftermath of the consent decree, the parties in the present proceeding filed numerous motions for summary judgment addressing the insurers' duty to defend and indemnify OMC. The circuit court of Lake County entered partial summary judgment in favor of OMC and against Liberty, finding that Liberty had a duty to defend OMC in the underlying environmental litigation. The circuit court further granted summary judgment in favor of Commercial, INA, International, and Northbrook, finding that "pollution exclusions"

contained in their respective policies barred coverage. An interlocutory appeal was taken, and this court affirmed the trial court's rulings. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 212 Ill. App. 3d 231 (1991). The Illinois Supreme Court granted leave to appeal and subsequently affirmed in part, reversed in part, and remanded the cause for further proceedings. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992). With the exception of International, the supreme court reversed the grant of summary judgment in favor of the insurers on the pollution exclusion issue and remanded for further proceedings in connection therewith. The court also found that material questions of fact existed with respect to whether OMC possessed knowledge of a probable loss at the time it purchased insurance so as to bar its claim for insurance under the "known loss" doctrine.

Prior to trial on remand, OMC entered into settlement agreements with its primary insurers, Liberty and Commercial, and with a second-layer excess carrier, Interstate Insurance Company (Interstate). Pursuant to its settlements with Liberty and Commercial, OMC received $14 million. There was no allocation of the portion attributable to defense of the underlying environmental claims as opposed to indemnification for those claims. OMC's annual policy limit for the Liberty policy was $250,000 per year, while the limit for the three-year Commercial policy was $250,000 per occurrence.

## TRIAL COURT FINDINGS

In December 1993, ESLIC and Home brought motions for partial summary judgment. In that regard, ESLIC argued that it did not owe OMC under the ESLIC II policy because of the "prior policy" provision contained in that policy. Home argued that it did not owe OMC under its Home I policy and that it owed no more than $2 million under the Home II policy because of a "non cumulation of liability" clause found in both policies. In May 1994, the trial court granted in part and denied in part ESLIC's and Home's partial motions for summary judgment. Specifically, the trial court ruled that ESLIC owed no coverage under the ESLIC II policy on account of the "prior policy" clause. The trial court further ruled that if ESLIC owed OMC $3 million under the ESLIC I policy, then Home would not owe OMC anything under the Home I policy. However, the court decided that it would not double credit a $3 million ESLIC payment by also applying it to the Home II policy. Thus, Home was held to face a potential liability limit of $5 million under the Home II policy.

The trial court issued its written memorandum of opinion on April 20, 1995, finding that (1) OMC's contamination of Waukegan

Harbor constituted a single continuing occurrence which took place between 1953 and 1976; (2) the PCB contamination was not expected or intended by OMC during the periods of the defendants' policies, nor did OMC know or have reason to know of a probable loss from PCB contamination at the time it purchased the Northbrook policy; and (3) the continuing occurrence triggered coverage under each of the defendants' policies. The court then reviewed the expert testimony and found it highly speculative as to the percentage of damage actually attributable to each of the policy periods. The court concluded that it was impossible to allocate damages for any given year with any degree of certainty and that, under the circumstances, the best method of damage allocation was to apply a *pro rata*, "time-on-the-risk" approach. Since OMC had no insurance from 1953 through 1958, its recoverable damages in the instant case were reduced by one-fourth of its total stipulated damages, which amounted to a $4.375 million reduction. The court then addressed the task of applying credit against the remaining amount of damages on account of OMC's settlements with its primary insurers. Noting that it is axiomatic that excess coverage cannot ensue until the primary layer of coverage has been exhausted, the court applied a $4.5 million credit for OMC's settlements with Liberty and Commercial and a $225,000 credit for OMC's settlement with Interstate, thus reducing OMC's recoverable damages by an additional $4.775 million to $8.4 million. The court then apportioned the $8.4 million in damages among the defendants based on the time-on-the-risk approach, taking into consideration the court's previous partial summary judgment rulings on ESLIC's "prior insurance" clause and the "non cumulation of liability" clauses in the Home and Northbrook policies. After applying this approach, the trial court found that OMC could receive a total of $8.1 million in damages. Specifically, the court entered judgment against ESLIC for $3 million (ESLIC I $3 million, ESLIC II $0), against Home for $4.8 million, and against American for $300,000. The court entered judgment in favor of Northbrook and against OMC, finding that Northbrook had no coverage responsibility because of an "exhaustion of policy limits by application of a non cumulation provision."

## ANALYSIS

### I. OMC'S APPEAL

#### A. TIME ON THE RISK

On appeal, OMC first argues that the trial court erred in allocating damages to OMC on a time-on-the-risk basis for the period in

which OMC had no insurance from 1953 to 1958. OMC contends that the trial court's approach was at odds with language in the various policies requiring the insurer to indemnify OMC for "all sums" it became obligated to pay on account of property damage arising out of an occurrence. OMC claims that the supreme court's (and appellate court's) pronouncement in *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), requires a different result and that other jurisdictions that have considered the issue have rejected a time-on-the-risk apportionment between insurers and policyholders (*Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981); *J.H. France Refractories Co. v. Allstate Insurance Co.*, 534 Pa. 29, 626 A.2d 502 (1993); *Monsanto Co. v. C.E. Heath Compensation & Liability Insurance Co.*, 652 A.2d 30 (Del. 1994); *Sandoz, Inc. v. Employer's Liability Assurance Corp.*, 554 F. Supp. 257 (D.N.J. 1983); *Transport Insurance Co. v. Lee Way Motor Freight, Inc.*, 487 F. Supp. 1325 (N.D. Tex. 1980)). OMC also argues that making it responsible for a portion of its damages was inappropriate because its liability arose under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 *et seq.* (1988)), which provides that any owner or operator of a site at any point in time is jointly and severally liable for all remediation costs (42 U.S.C. § 9607 (1988)). Since its liability attaches for operation of the facility at any point in the 24-year period and not necessarily for the entire 24-year period, OMC claims that the time-on-the-risk approach cannot be applied. Lastly, it claims that damages cannot be apportioned to it because the USEPA complaint only alleged liability for contamination after 1959.

With the exception of the American policy, which requires the insurer to indemnify the insured for "ultimate net loss" occurring in the policy period, and the Home policy, which limits the all-sums language by specifically stating that it is "subject to the limitations, terms and conditions hereafter mentioned," the other comprehensive general liability (CGL) policies at issue provide: "The insurer agrees to indemnify the insured for all sums which the insured shall be obligated to pay *** on account of *** property damage arising out of any one occurrence." "Occurrence" is defined in various ways in the respective policies as "one happening or series of happenings arising out of or resulting from one event taking place during the term of this policy"; it is also defined as "an accident or a happening or event of a continuous or repeated exposure to conditions which unexpectedly or unintentionally results in *** property damage[;] *** all such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

■ In addition to the theory that coverage under a policy is triggered when the pollutant is discovered, courts have identified and implemented at least four types of "triggers" in deciding (in the context of a claim involving multiple policies) which insurance policy, if any, provides coverage for a specific claim:

"If coverage is triggered at the time that personal injury or property damage becomes known to the victim or property owner, the approach is identified as the 'manifestation theory.' [Citation.] If coverage is triggered when real personal injury or actual property damage first occurs, the approach is called the 'injury in fact theory.' [Citation.] If coverage is triggered when the first exposure to injury-causing conditions occurs, then the court is said to have chosen the 'exposure theory.' [Citation.] Finally, if coverage is triggered in a manner such that insurance policies in effect during different time periods *all* impose a duty to indemnify, then the approach is labelled a 'continuous' or 'multiple' trigger theory." (Emphasis in original.) *Dow Chemical Co. v. Associated Indemnity Corp.*, 724 F. Supp. 474, 478 (E.D. Mich. 1989).

In *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), the Illinois Supreme Court addressed trigger of coverage in the context of cases involving *bodily injury* from asbestos exposure. There, the court applied a theory of "triple triggers"—it held that the policies were triggered at the initial exposure, when the disease manifested itself, and at any interim time when the claimant manifested some sickness. The court further noted that, between the time exposure to asbestos ceases and the time an asbestos-related disease becomes diagnosable, there is no continuous injury. The court noted that "sickness" may take place in the period before clinical manifestation of the disease and whether and when a claimant suffered sickness must be determined on a case-by-case basis. *Zurich* did not involve a claim for *property damage* or coverage for excess insurance.

■ In *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598 (1994), the court addressed the issue of the appropriate trigger coverage for asbestos property damage claims involving primary and excess insurance. The *Gypsum* court recognized that "bodily injury" and "property damage" are two distinct concepts which may require different characterizations of their respective coverage triggers. In adopting a continuous-trigger theory, the court found support from the *Zurich* decision and noted:

"Conceptually, the injury-in-fact trigger and the continuous trigger are on the same continuum and are complementary, rather than mutually exclusive. Accordingly, courts have stated that 'where injury-in-fact occurs continuously over a period covered by

different insurers or policies, and actual apportionment of the injury is difficult or impossible to determine, the continuous injury trigger may be employed to equitably apportion liability among insurers.' " *Gypsum*, 268 Ill. App. 3d at 644, quoting *Sentinel Insurance Co. v. First Insurance Co. of Hawai'i, Ltd.*, 71 Haw. 277, 298, 875 P.2d 894, 917 (1994).

■ We find the *Gypsum* court's rationale persuasive in applying the continuous-trigger theory and further find that the trial court correctly applied it to the facts of the instant case by finding that all of the policies were triggered and that the contamination of Waukegan Harbor amounted to a single continuing occurrence.

■ We must now address the questions of whether any of OMC's damages should be apportioned to it and how damages should be apportioned among the various insurers. This is an issue of first impression in Illinois.

OMC relies on the policy language that the insurers agreed to pay "all sums." However, OMC ignores the further limitation that the sums the insurer is obligated to pay must be on account of property damage arising out of an occurrence during the policy period. In *Gypsum*, the insured argued that it could reach its excess insurance policies simply by exhausting one of its multiple primary policies. The court held that Gypsum had to exhaust all available primary coverage before proceeding against an excess carrier. In so doing, the court noted:

> "If Gypsum is, in effect, self-insured over several policy periods, the decision on the primary exhaustion issue will determine whether Gypsum will have to absorb only the amount of one triggered policy period before seeking excess coverage or whether it must absorb multiple periods, *i.e.*, exhaust all triggered primary insurance, before seeking excess coverage.
>
> *** If Gypsum's argument allowing an excess insurance policy to be reached upon the exhaustion of one primary policy is accepted, Gypsum could avoid absorbing the cost resulting from its position as a self-insurer in the other triggered policy periods and seek coverage from any number of excess carriers." *Gypsum*, 268 Ill. App. 3d at 652-53.

We find that *Gypsum* supports an allocation of the damages to OMC for the years during which it carried no insurance. This is the only fair approach. While the insurers agreed to indemnify OMC for "all sums," it had to be for sums incurred during the policy period. *Gypsum* supports the notion that OMC cannot shift its responsibility for uninsured years to its excess carriers.

The trial court's allocation of damages to OMC for its uninsured years is also supported by *Northern States Power Co. v. Fidelity & Ca-*

*sualty Co.*, 523 N.W.2d 657 (Minn. 1994). There, the Minnesota Supreme Court held:

> "[T]he contamination of the groundwater should be regarded as a continuous process in which the property damage is evenly distributed over the period of time from the first contamination to the end of the last triggered policy (*or self-insured*) period, and we have also held that the total amount of property damage should be allocated to the various policies in proportion to the period of time each was on the risk." (Emphasis added.) *Northern States Power Co.*, 523 N.W.2d at 664.

Other courts have also apportioned coverage among insurers based upon the time each policy was on the risk and then included the policyholder in the allocation scheme and held the policyholder responsible for a *pro rata* share for periods of no insurance or self-insurance. See *Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1202-04 (2d Cir. 1995); *Commercial Union Insurance Co. v. Sepco Corp.*, 765 F.2d 1543, 1544 (11th Cir. 1985); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1225 (6th Cir. 1980).

In *Forty-Eight Insulations*, a case involving coverage for asbestos-related injuries, the United States Court of Appeals for the Sixth Circuit held that the insured had to pay its fair share of defense costs for uninsured periods. In so holding, the court noted:

> "The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk.
>
> \*\*\* The different insurance companies will pro-rate defense costs among themselves. It is reasonable to treat Forty-Eight as an insurer for those periods of time that it had no insurance coverage. Were we to adopt Forty-Eight's position on defense costs a manufacturer which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as a manufacturer which had coverage for 20 years out of 20. Neither logic nor precedent support[s] such a result." *Forty-Eight Insulations, Inc.*, 633 F.2d at 1224-25.

A California court summed up the rationale of the case law allocating responsibility to the manufacturer for uninsured years as follows:

> " 'A firm that fails to purchase insurance for a period \*\*\* is self-insuring for all the risk incurred in that period; otherwise it would

be receiving coverage for a period for which it paid no premium. Self-insurance is called "going bare" for a reason.' [Citation.] Or as stated by Judge Wald in her concurring opinion in *Keene*, supra, 'I just do not understand why an asbestos manufacturer, which has consciously decided not to insure itself during particular years of the exposure-manifestation period, should have a reasonable expectation that it would be exempt from any liability for injuries that were occurring during the uninsured period.' [Citations.]" *IMCERA Group, Inc. v. Liberty Mutual Insurance Co.*, 42 Cal. App. 4th 1754, 1792, 50 Cal. Rptr. 2d 583, 607 (1996).

We recognize that some courts have taken a contrary approach and have refused to allocate any responsibility to the insured for uninsured years. See *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.*, 45 Cal. App. 4th 1, 52 Cal. Rptr. 2d 690 (1996); *Keene Corp.*, 667 F.2d at 1047-49; *J.H. France Refractories Co. v. Allstate Insurance Co.*, 534 Pa. 29, 39, 626 A.2d 502, 508 (1993). The rationale for this approach appears to be that the insured's security would be undermined if it were held responsible for periods in which it was uninsured and the policy would fail to serve its function of relieving the insured of all risk of liability. *Keene Corp.*, 667 F.2d at 1047-49. We decline to follow this approach for the reasons previously stated.

■ Additionally, we note that OMC's joint and several liability argument must be rejected. OMC cites no authority for its novel proposition that, because its liability under CERCLA is joint and several, the liability of the excess insurers cannot be apportioned on a *pro rata* basis. OMC ignores the principle that insurance coverage disputes are governed by contract law. See *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486 (1985). We can find no rationale to support the imposition of joint and several liability upon the insurers simply because OMC's liability arose under CERCLA.

■ Having concluded that OMC should be responsible for the years it had no insurance and that this should be deducted from the *pro rata*, time-on-the-risk allocation among the insurers, another question to be addressed is whether the "other insurance" and "non cumulation of liability" clauses can be enforced. We find that it would be illogical to enforce one insurer's clause in a situation involving a "continuous occurrence" which theoretically could be looked at as a separate occurrence for the purpose of each policy which has been assessed a *pro rata* damage allocation. We find that the "other insurance" clauses cannot be applied because each excess insurer is only paying a *pro rata* portion of the total damages attributable to this "continuing occurrence." To apply the "prior insurance" and "non

cumulation of liability" clauses would give the insurers a double credit and would deprive the insured of the full value of its premium. Additionally, we note that enforcement of the clauses would be inequitable because no excess insurer is concurrently liable with any other and application of the clauses would make the other insurers liable for damages occurring outside of their policy periods.

■ For the reasons which will be more fully explained in ESLIC's cross-appeal, we find that the trial court correctly concluded that a *pro rata*, time-on-the-risk allocation of damages should be applied. However, we further find that the trial court erred in its ultimate application of that approach. In that regard, we hold that damages should simply be calculated by applying any applicable limits and comparing that with the *pro rata* share and, depending on which is less, the lesser amount should be the insurer's damages for its policy period.

## B. CREDIT FOR SETTLEMENT WITH PRIMARY INSURERS

Next, OMC argues that the trial court erred in crediting $4.5 million against OMC's stipulated damages on account of OMC's settlement with its primary insurers, Liberty and Commercial. It contends that, at most, only $1.75 million of the $14 million paid in the settlements should have been applied on account of those settlements as indemnification.

OMC's $12 million settlement with Liberty covered the primary policy period from 1959 to 1974. The settlement stated that the amount of the settlement constituted reimbursement for defense costs and exhaustion of all applicable policy limits with respect to the environmental claims. The settlement agreement further noted that the parties to it disagreed as to the precise allocation between expense costs and reimbursement but that they did agree that the payment is deemed to exhaust all of the policy limits of all the Liberty policies in connection with the environmental claims. The Liberty policies at issue have a per-occurrence property damage limit of $250,000 per year. Thus, the trial court applied a credit of $250,000 and multiplied it by the 15 policy years that Liberty was on the risk.

OMC points to certain "anti-stacking" and "per occurrence and aggregate property damage liability limits" language in the Liberty and Commercial policies and contends that the indemnity limit of all the Liberty policies combined was exhausted at $1.5 million and that the indemnity limit of the Commercial policy was exhausted at $250,000.

■ We find that the settlement agreements themselves do not purport to limit the portion attributable to indemnity. More

importantly, the clauses in the Liberty policies which OMC now attempts to rely on were never asserted by the parties prior to the settlement. In fact, OMC argued that it was entitled to indemnification from its primary insurers "up to the limits set forth" in the policies. Since OMC characterizes the noncumulation of liability clauses in the excess insurers' policies as exclusions rather than policy limits on liability, we find that it would be inconsistent for OMC to now claim that it was not entitled to the yearly policy limits on liability. We believe that the excess insurers were entitled to rely on OMC's representations of the policy limits of its primary insurance. However, we also find that the trial court erred in applying a $750,000 credit for OMC's settlement with Commercial since the per-occurrence limit of that policy was only $250,000 per occurrence for the entire three-year period. Accordingly, we find that the trial court should have applied an indemnification credit of $4 million instead of $4.5 million for OMC's settlements with Liberty and Commercial.

## C. DOUBLE CREDIT FOR INTERSTATE SETTLEMENT

■ OMC claims that the trial court erroneously double credited the settlement with Interstate an additional $300,000. We note that Home and Northbrook concede in their appellate briefs that the trial court erred with respect to this issue. The other insurers do not respond to the argument in their appellate briefs. Given the insurers' concessions and since we cannot determine from the record the reason the trial court credited the Interstate settlement a second time, we agree that the trial court erred in deducting an additional $300,000 from the amount of possible damages OMC could recover.

## D. ESLIC II POLICY

OMC next argues that the trial court erroneously ruled that the ESLIC II policy (1962-65) afforded no coverage to OMC. In reaching its conclusion that no coverage existed under ESLIC II, the court relied on the following "prior policy" provision found in ESLIC II:

"[I]f any occurrence happens during the policy period of this policy which results in *** property damage *** and if the property damage also happened during the policy period of any similar policy of insurance issued by the company *** prior to the policy period of this policy, that policy issued by the company which is in force at the time *the first claim is made against the insured* which could result in ultimate net loss payable thereunder shall constitute the only policy of the company which shall apply to such occurrence and to all *** property damage *** at any time resulting from such occurrence, regardless of the number of similar policies

of insurance issued by the company which could otherwise apply in the absence of this agreement."

■ OMC contends that the clause only applies to bar coverage under ESLIC II if a claim is made during the ESLIC I policy period (1959-62); therefore, since a claim was not made during that time, the clause has no application. We agree.

The arguments of ESLIC in response are unpersuasive. It contends that the clause should be interpreted as "whether a claim *could have* been made against OMC." It cites a 1959 OMC memo which notes that a "soapy film" was present in the harbor which "can cause the complaints which are bothering you." Thus, ESLIC makes the observation that claims could have been brought in the early 1960s. However, the crucial inquiry under the language of the policy is not whether claims "could" have been made. Rather, it unambiguously provides that a claim must be made which could result in an ultimate net loss. We find that the policy's plain meaning should be given effect. We also reject ESLIC's argument that in 1962 these types of latent injury claims were not contemplated; therefore, the intent of the policy should be given effect, barring coverage for an occurrence that was already covered under a prior ESLIC policy. Even if ESLIC's theory was correct, we would find that such a situation, which does not fit squarely into the policy, at best creates an ambiguity which should be construed against the insurer that drafted the policy.

Given our holding that the prior insurance clause does not bar coverage and that ESLIC II does in fact provide coverage to OMC, the question then becomes what is the amount of that coverage. For reasons we address in ESLIC's cross-appeal, we find that OMC should be able to recover $1,520,833 under ESLIC II.

E. HOME AND NORTHBROOK—NONCUMULATION OF LIABILITY CLAUSES

Next, OMC argues that the trial court erred in reducing the available policy limits of the Home and Northbrook policies. It contends that the court misinterpreted the following language:

"It is agreed that if any loss covered hereunder is also covered in whole or in part under any excess policy issued to the Insured prior to the inception date hereof, the limit of liability hereon as stated in Item 2 of the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance."

OMC urges that the "loss" covered under each of the respective policies (Home I 1965-68, Home II 1968-71, Northbrook 1975-76) was

the property damage that actually occurred during each of those policy periods. It contends that each policy covers a distinct and different loss and that the trial court confused an "occurrence" with a "loss." Since PCB contamination took place during each of the policy periods, the loss involved in each of the Home and Northbrook policies is different from the loss involved in the prior excess policies of ESLIC. Thus, the policy limits of the Home and Northbrook policies should not have been reduced by the above-quoted prior insurance clause.

■ For the reasons previously stated in part A of OMC's appeal, we find that the "other insurance" and noncumulation of liability clauses in the Home and Northbrook policies cannot be applied under the instant circumstances.

One of the various dictionary definitions of the word "loss" is "the amount of an insured's financial detriment due to the occurrence of a stipulated contingent event (as death, injury, destruction, or damage) in such a manner as to charge the insurer with a liability under the terms of the policy." Webster's Third New International Dictionary 1338 (1993). The "loss" OMC suffered was the property damage that occurred over the course of 24 years. As we have previously noted, the application of the clause as the insurers suggest would be illogical and at odds with the other policy language given the nature of this "occurrence" and our application of the *pro rata*, time-on-the-risk theory.

## II. ESLIC'S CROSS-APPEAL

### A. ESLIC I

In its cross-appeal, ESLIC generally supports the trial court's *pro rata* by time-on-the-risk apportionment of damages. However, ESLIC claims that the trial court erred in its application of that method. It claims that the only appropriate method of allocation, based on the case law relied upon by the trial court, is to divide the total stipulated damages of $17.5 million by the 24 triggered years. That calculation provides for $729,166.66 in damages per year. Each of the insureds would then be entitled to a $250,000 deduction from the yearly damages as a result of a credit applied for the underlying primary insurance, which would leave a maximum potential damage recovery of $479,166.66 per policy year. However, we have previously noted the proper credit to be applied for the underlying primary insurance was $4 million instead of $4.5 million. Consequently, we find that each of the insurers is entitled to $222,222 credit per policy year as opposed to a $250,000 credit as argued by ESLIC. This leaves OMC's maximum potential recovery limit at $506,944 per policy year.

At any rate, ESLIC argues that the maximum amount per year that OMC could recover was further limited by the "Limits of Liability" section of the three-year ESLIC I policy. It contends that that section limits OMC's maximum potential recovery for the three-year period to $1 million.

▇▇ The construction of an insurance policy's provisions is a question of law. *Outboard Marine Corp.*, 154 Ill. 2d at 108. In construing an insurance policy, the court must ascertain the intent of the parties to the contract. To ascertain the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole with due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract. *Outboard Marine Corp.*, 154 Ill. 2d at 108. If the words in a policy are unambiguous, a court must afford them their plain, ordinary, and popular meaning. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74 (1991). However, if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer that drafted the policy. *Outboard Marine Corp.*, 154 Ill. 2d at 108-09; *Wilkin Insulation Co.*, 144 Ill. 2d at 74.

Keeping the above-mentioned principles in mind, we turn to the ESLIC I policy language. Under its terms, ESLIC agreed "[t]o indemnify the insured for all sums which the insured shall be obligated to pay by reason of the liability imposed upon it by law *** arising out of any one occurrence." The policy defines "occurrence" as "one happening or series of happenings arising out of or resulting from one event taking place during the term of this policy." The "Limits of Liability" section provides that "[t]he company shall only be liable for the ultimate net loss in excess of *** the amount recoverable under the underlying insurance set forth in the Declarations." That section further provides that "[i]n no event shall the company be liable for an amount in excess of that set forth in the Declarations as applicable to 'each occurrence.' " The declarations list a $1 million limit per occurrence. The "Limits of Liability" section continues by stating:

> "Subject to the limit of liability with respect to 'each occurrence' the aggregate limit of liability set forth in the Declaration applies separately to claims arising under the insurance afforded for Products Liability and to those arising out of personal injury by Occupational Disease sustained by any employee of the insured. *If the policy is written for a period of more than one year, the limits of liability apply separately to each annual period that this policy remains in force.*" (Emphasis added.)

ESLIC argues that the policy language is clear and that it only provides subsequent limits of $1 million for *distinct* occurrences. It relies heavily on the language stating that "in no event" shall the company be liable for an amount in excess of the declarations. OMC, on the other hand, contends that an ambiguity is created. It relies heavily on the last sentence in the above-quoted paragraph and claims that this "annual period" clause modifies the limits of liability set forth in the declarations. Therefore, OMC continues, it is entitled to recover $1 million (the amount set forth in the declarations) for *each year* of the ESLIC I policy and not $1 million in total.

■ After carefully reviewing the language of the policy, we find that the policy taken as a whole is unambiguous and is not susceptible to more than one reasonable interpretation. The parties' intent to limit liability to $1 million per occurrence was clearly established by language providing that "in no event" shall the company be liable for an occurrence beyond that set forth in the declaration. The "annual period" language relied upon by OMC must be read in context, which merely modifies the sentence before it, which begins by expressly reiterating that it is "[s]ubject to the limit of liability with respect to 'each occurrence.' "

■ Given our conclusion that the clause is unambiguous and provides for a $1 million limit per occurrence per policy period, we find that the trial court erred in awarding OMC $3 million under the ESLIC I policy. Accordingly, we modify the trial court's judgment to provide that OMC can recover only $1 million from ESLIC I. Parenthetically, we note that, even if we had found that the available limits of the ESLIC I policy were $3 million, we would nonetheless conclude that OMC was entitled to recover no more than $1,520,833 from ESLIC I, since the most OMC could recover from any of the excess policies was $506,944 per policy year.

### B. ESLIC II

■ For reasons stated previously in the portion of this opinion addressing OMC's appeal (see part C of OMC's appeal), we hold that ESLIC II provides coverage to OMC. For the same reasons stated in the discussion of ESLIC I (see part A of ESLIC's appeal), we further hold that ESLIC II provides $1,520,833 in coverage to OMC.

## III. HOME'S CROSS-APPEAL

### COMPUTATION OF DAMAGES—HOME I AND II

Home argues that the trial court's damages award with respect to the Home I and Home II policies was inconsistent with the court's foundational rulings and was fraught with computational errors.

■ We agree. As we have previously noted, Home's noncumulation of liability clause cannot be given effect. Thus, Home's liability under Home I was potentially $3 million, as the limit of liability per occurrence under the Home I policy was $3 million. However, under a true *pro rata*, time-on-the-risk approach, the most OMC could recover for any one policy year was $506,944. Accordingly, we find that Home's total liability to OMC under Home I is $1,520,833.

Turning to the Home II policy, we note that it also contained a noncumulation of liability clause which we likewise find unenforceable given the context of this case. The limit of liability under the Home II policy is $5 million. Consistent with the *pro rata*, time-on-the-risk approach, we find that the maximum recoverable per policy year was $506,944. Therefore, we further find that OMC was entitled to recover only $1,520,833 from the Home II policy.

## IV. AMERICAN'S CROSS-APPEAL

### "ULTIMATE NET LOSS" PROVISION

American relies on an "ultimate net loss" provision in its policy and contends that its policy only provides coverage after all the underlying primary and excess insurance is exhausted. It claims that the clause in question precludes any liability on the part of American given the proper deduction for other insurances in relation to the amount of OMC's damages.

American's policy was a second-layer excess policy with a $5-million-per-occurrence limit (see item 5 of the declarations) and was in effect from 1968 to 1971. Under the terms of the policy, American agreed to indemnify OMC:

"[A]gainst ultimate net loss in excess of and arising out of the hazards covered and as defined and in excess of the underlying insurance as shown in Item 4 of the Declaration (*** 'underlying insurance') but only up to an amount not exceeding the limit(s) shown in Item 5 of the Declarations."

Item 4 of the declaration named Home as the excess insurer and stated that American's insurance was to be in excess of Home's $5 million-per-occurrence limit. American relies on the policy's definition of "ultimate net loss" to avoid coverage. That provision states:

"Ultimate net loss, as used herein, shall be understood to mean the sums paid in settlement of losses for which the Insured is liable after making deductions for all recoveries, salvages, and other insurances (other than recoveries under the underlying insurance, policies of co-insurance, or policies specifically in excess hereof), whether recoverable or not."

American focuses on the last phrase of the above paragraph and

argues that it is entitled to at least a $23 million deduction for all the policy limits of all the excess insurance maintained by OMC—$3 million for ESLIC I, $2 million for ESLIC II, $3 million for Home I, $5 million for Home II, $5 million for International, and $5 million for Northbrook.

OMC contends that the "recoverable or not" language means the actual coverage available after any conditions or exclusions are applied. It distinguishes the case law cited by American on the basis that those cases involved insolvent excess insurers and so in those cases the insurance existed but it was not recoverable.

American correctly notes the rationale for not requiring it to "drop down" to recover the reduced limits of an underlying excess policy. "Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a *predetermined* amount of primary coverage has been exhausted. A second insurer thus greatly reduces his risk of loss. This reduced risk is reflected in the cost of the policy." (Emphasis added.) *Whitehead v. Fleet Towing Co.*, 110 Ill. App. 3d 759, 764 (1982). Thus, we find that American is clearly entitled to a deduction for the policy limits ($5 million for the Home policy) listed in the declaration.

Again, we note that American only agreed to indemnify OMC against the *excess* ultimate net loss *arising out of hazards as covered and defined* in the Home II policy. The American policy also "followed" the conditions and exclusions of the Home II policy. Thus, the American policy tracks the Home II policy and covers damages that are in excess of those covered by the Home II policy.

■ In its definition of "occurrence," the Home II policy states that the property damage must occur during the policy period. Thus, the American policy covered the ultimate net loss for an "occurrence" in the policy period. OMC argued in its appeal addressing Home's noncumulation of liability clause that each policy covers a distinct and different loss. Under the *pro rata*, time-on-the-risk approach, we previously found that the maximum total recoverable damages per three-year policy period was $1,520,833. The American policy is a secondary excess policy which only provides coverage after the $5 million limit of the Home II policy is exhausted. Since the total damages for the three-year period of the policy were less than OMC's ultimate net loss attributable to those years, American has no liability under its policy.

Our resolution of the foregoing issue renders it unnecessary for us to address the parties' arguments about the "other insurances" and "recoverable or not" language of the policy. Likewise, the issue regarding American's incorporation of Home's noncumulation of liability clause is rendered moot.

# V. NORTHBROOK'S CROSS-APPEAL

## A. "KNOWN LOSS" DOCTRINE

Initially, we note that the trial court found that Northbrook had no liability because after applying its noncumulation of liability clause its policy limits were reduced below zero. However, we have previously found that Northbrook's noncumulation of liability clause cannot be applied here. Thus, we must address Northbrook's argument that the trial court should have found that the "known loss" doctrine bars coverage of OMC's claim against the Northbrook policy. Northbrook argues that OMC knew or had reason to know that it will suffer or has already suffered a loss. It points to the letters OMC received from Monsanto and contends that OMC should have known that Pydraul was laden with PCB and that it was severely contaminating Waukegan Harbor.

■ If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss. *Outboard Marine Corp.*, 154 Ill. 2d at 103. Where the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the " 'risk of liability is no longer unknown.' " *Outboard Marine Corp.*, 154 Ill. 2d at 103, quoting *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 63 (3d Cir. 1982).

In the present case, the supreme court determined that OMC suffered a "known loss" at least as of February 1976 when it received a USEPA complaint detailing the PCB contamination of the harbor. On remand, the trial court found that there was no known loss any time before the USEPA complaint. Northbrook argues that the trial court applied the wrong standard because during the course of its oral pronouncement it mentioned that OMC was not acting in bad faith.

The trial court's comments viewed in context indicate that, while the court did mention a lack of bad faith, it also clearly mentioned that it found OMC did not know that there was a substantial probability that it would suffer a known loss. We find that the trial court's conclusion was not against the manifest weight of the evidence. While it is troublesome that OMC received a letter in 1970 informing it that the Pydraul it was using contained PCBs and that it continued to exhaust its current stock of PCB-laden Pydraul until February 1, 1971, the record indicates that OMC made modifications to its manufacturing system and that it believed that Pydraul would not

be discharged into the harbor. Moreover, the record does not clearly establish that prior to the 1976 USEPA complaint OMC had reason to know that it would suffer or had suffered a loss as a result of PCB contamination of the harbor. Accordingly, we find that OMC was not barred from obtaining coverage under the Northbrook policy on account of the "known loss" doctrine.

## B. POLLUTION EXCLUSION

■ Northbrook relies on its pollution exclusion clause and the same facts as its prior argument on "known loss" and contends that the exclusion precludes coverage for OMC. That exclusion precludes coverage if the pollution is not "sudden and accidental." Northbrook's argument must be rejected. The supreme court in the prior appeal in this case analyzed that clause and interpreted it in favor of OMC. *Outboard Marine Corp.*, 154 Ill. 2d at 117-24. At any rate, our resolution of the foregoing issue on the "known loss" doctrine precludes acceptance of Northbrook's contentions on the pollution exclusion issue.

## C. INJURY IN FACT DURING NORTHBROOK POLICY

Northbrook argues that it cannot be held liable on a *pro rata*, time-on-the-risk basis because it only insured OMC for one year— 1975—a year for which experts on both sides agreed that no more than $88,000 worth of damages occurred. Deducting the credit for the primary insurance for that period would leave Northbrook with no liability under its policy. The trial court rejected Northbrook's argument and found both experts' testimony extremely speculative about the amount of damages attributable to any given period. In that regard, the court noted:

> "Roy O. Ball *** testified on behalf of OMC. *** The court has thoroughly reviewed Dr. Ball's testimony and finds that, when weighed against the totality of the other evidence presented, his conclusions merit little weight or consideration. *** Dr. Ball went on, with an apparent lack of self persuasiveness, to attempt to allocate percentages of discharges and contamination to each year in question. Once again the court is suspect of such opinion due to the very speculative and unsupported method by which factoring percentages were determined.

> The defendant insurance companies jointly offered the testimony of Louis M. Vasseur as their expert. Mr. Vasseur *** [was] minimally qualified to offer testimony. [I]n the final analysis his attempted percentage allocation suffered the same speculative fate. ***

*** [W]hile it can reasonably be inferred that discharges may have been disproportionate throughout the various years in question, it appears to be virtually impossible to allocate with any degree of acceptable certainty, the exact percentages of discharges and resulting contamination for any given year."

■ The weight accorded expert testimony must be decided by the trier of fact. *In re Glenville*, 139 Ill. 2d 242, 251 (1990). Even if several competent experts concur in their opinion and no opposing expert testimony is offered, it is well within the province of the trier of fact to weigh the credibility of the expert evidence and decide the issue. *In re Glenville*, 139 Ill. 2d at 251. Although uncontradicted and unimpeached testimony of an expert cannot be rejected arbitrarily (*In re Glenville*, 139 Ill. 2d at 251), subjective and unclear testimony need not be given credence by a trier of fact enjoined by law to avoid speculation, guess, or conjecture in its verdict (*Bledsoe v. Amiel*, 57 Ill. App. 3d 54, 56 (1978)). Expert testimony is to be accorded such weight that, in light of all the facts and circumstances of the case, reasonably attaches to it. *In re Glenville*, 139 Ill. 2d at 251.

Applying the above-mentioned principles, we are unable to say that the trial court erred in distributing the damages over a 24-year period. Although OMC's expert agreed that damages for 1975 were no more than $88,000, he also noted that it was "basically not possible to apportion PCB releases among years or policy periods." Given the speculative nature of the experts' testimony and the difficulty of computing the amount of damage caused to the harbor in any given year, we will not disturb the trial court's exercise of discretion on this matter. Accordingly, we conclude that Northbrook's liability to OMC under its policy was $506,944.

## CONCLUSION

In summary, we hold that damages must be apportioned among the insurers on a *pro rata*, time-on-the-risk basis up to the applicable policy limits and that the insurers must be given a credit for exhaustion of the primary policy limits and for the six-year period when OMC carried no insurance. We further hold that under the circumstances of the present case the "prior insurance" and "non cumulation of liability" clauses in the various policies cannot be read to avoid coverage to OMC. Thus, we conclude that the various insurers are liable to OMC under their respective policies as follows: ESLIC I—$1 million; ESLIC II—$1,520,833; Home I—$1,520,833; Home II—$1,520,833; American—$0; and Northbrook—$506,944.

656

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

BOWMAN and RATHJE, JJ., concur.