[J-37-2013][M.O. – Baer, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY | : | No. 86 MAP 2012 |
| | : | |
| | : | Appeal from the Order of the Superior |
| | : | Court at No. 277 EDA 2011 dated |
| V. | : | 11/28/11 affirming the order of the |
| | : | Chester County Court of Common |
| | : | Pleas, Civil Division, at No. 09-6388 |
| JOHN D. ST. JOHN AND KATHY M. ST. | : | dated 12/20/10 |
| JOHN, INDIVIDUALLY AND D/B/A | : | |
| THUNDER VALLEY FARM AND LPH | : | |
| PLUMBING AND HEATING, LLC AND | : | ARGUED: May 7, 2013 |
| STOLTZFUS WELDING AND REPAIR | : | |
| | : | |
| | : | |
| APPEAL OF: JOHN D. ST. JOHN AND | : | |
| KATHY M. ST. JOHN | : | |

## DISSENTING OPINION

**MR. JUSTICE SAYLOR**            **DECIDED: December 15, 2014**

I would dismiss this appeal as having been improvidently granted. My reasoning follows.

In some lines of insurance law decisions, it is difficult to discern the degree to which the courts are applying conventional principles of contract construction or layering doctrinal innovations over salient policy terms based upon practical or equitable considerations. See, e.g., J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 38, 626 A.2d 502, 507 (1993) (holding that exposure to asbestos, as well as all phases of an ensuing disease, independently trigger coverage). From my own point of view, I believe that it is important to be clear about which of these approaches is being applied in the course of judicial review and, if it is the latter, to provide an appropriate

justification for any departures from policy provisions and/or ordinary rules of construction. In all events, as the majority notes, the analysis should at least begin with the insurance policy in issue. See Majority Opinion, slip op. at 24 ("The goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy.").

In the present matter, however, the appellants' argumentation does not hew to the policy language. For example, as a main premise within their arguments, Appellants take the position that the "occurrence," for purposes of the Penn National commercial general liability policies, was a discrete one in the form of LPH Plumbing's negligent installation of the gray water collection and drinking water systems at Thunder Valley Farm in early 2003. See Brief for Appellants at 18; see also Majority Opinion, slip op. at 16. The policies, however, define "occurrence" to include "continuous or repeated exposure to substantially the same general harmful conditions." Majority Opinion, slip op. at 6 (citation omitted). Thus, facially, the ongoing poisoning of a dairy herd qualifies as a continuing "occurrence" under the policies, contrary to Appellants' present depiction of a discrete occurrence. I believe that this sort of incongruity, when attached to a critical premise, impacts this Court's ability to fashion an opinion which would offer meaningful guidance beyond the idiosyncratic parameters set by the arguments.

A similar concern arises in relation to Appellants' approach to a coverage-triggering "manifestation" in their treatment of the first two issues accepted for review. In this regard, their arguments appear to assume that coverage is triggered only by a "first manifestation," an assumption which does not appear to be borne out specifically in terms of the Penn National policies. See, e.g., Brief for Appellants at 17 ("The dispositive issue with respect to the first two questions . . . is: [w]hen did the effects of

[the underlying negligence] <u>first manifest</u> in a way that would put a reasonable person on notice of injury?" (emphasis added, internal quotation marks omitted)). Under Section I(1)(b)(2) of the policies, coverage applies generally to property damage that occurs during the policy period. <u>See</u> R.R. 387a, 405a. Significantly, there is no specifically articulated basis to exclude coverage if similar property damage took place during a previous policy period – unless LPH had knowledge of an occurrence or claim, which it did not before 2006.[1] Since Penn National stipulated that property damage took place during each of the three policy periods, <u>see</u> Stipulation at 2 ¶14, R.R. 166a, I am unable to discern an explicit reason deriving from unambiguous policy language brought into issue in this appeal why coverage should not obtain under each such period.[2]

I also have reservations concerning the majority's analysis. For example, the majority opinion often recognizes the conceptual difference between an "occurrence" and a "trigger" of coverage (such as first manifestation). <u>Compare</u>, <u>e.g.</u>, Majority Opinion, <u>slip</u> <u>op.</u> at 6 (defining "occurrence" for purposes of the Penn National policies), <u>with</u> <u>id.</u> at 23 (providing a different definition for "trigger of coverage"). Nevertheless, the

---

[1] Indeed, as further discussed below, the majority is able to discern such a limitation only by postulating about the "reasonable expectations" of the insurer and policyholder, an analysis which I believe is substantially problematic in its own right. <u>See</u> <u>infra</u>.

[2] To the degree that Appellants' arguments accept a limiting principle deriving from pre-existing impairment of property, it may also be observed that Appellants' herd was subject to change: during the 2003-2006 timeframe, new cows were rotated into the herd and experienced adverse effects due to their exposure to contaminated water, <u>see</u> N.T., June 10, 2010, at 74-75, and calves were born with deformities and complications requiring surgery to the maternity cow. <u>See</u> <u>id.</u> at 35-36, 52-54, 77-78. Under these circumstances, to the degree to which the herd is being conceptualized as a single unit of property, this would seem to me to represent an abstraction from the facts that appears problematic relative to any present undertaking to clarify Pennsylvania insurance law.

majority cites affirmatively to cases which conflate these insurance-law concepts. See, e.g., id. at 28-29 (relying upon D'Auria v. Zurich Insurance Co., 352 Pa. Super. 231, 507 A.2d 857 (1986), for the proposition that "[a]n occurrence happens when the injurious effects of the negligent act first manifest themselves in a way that would put a reasonable person on notice of injury" (emphasis in original)). Of course, occurrence and manifestation for purposes of the present case must be different, because the parties have accepted that the salient "occurrence" was the negligent systems installation, and the manifestation relates to the later-ensuing impairments to Appellants' dairy herd.

More broadly, given the constraints arising from the manner in which this appeal has been presented, the majority opinion should not be read for the proposition that the policy language in issue actually must be taken as either establishing a first-manifestation rule or a multiple trigger regime within the purview of the J.H. France decision. Those are merely the two alternatives presented to the Court, neither of which, I believe, necessarily tracks the language of the insurance policies or flows from an appropriate construction of ambiguous policy language per application of conventional principles of contract law.

Indeed, the majority ultimately discerns a critical ambiguity in the policy language, but it nevertheless declines to apply the rule of construction (which it otherwise acknowledges should pertain) that "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage," Majority Opinion, slip op. at 24 (quoting 401 Fourth St., Inc. v. Investors Ins. Grp., 583 Pa. 445, 455, 879 A.2d 166, 171 (2005)). See id. at 35-41. In this regard, the majority recognizes that Penn National stipulated that Appellants' property damage arising from exposure to the

contaminated water took place during the coverage period of each of its policies. See Stipulation at 2-3, ¶¶14, 25. The majority further acknowledges that, under these circumstances, the policies could be construed to support Appellants' multiple-trigger theory per the third issue accepted for review. See Majority Opinion, slip op. at 36. Still, the majority refers to the parties' "reasonable expectations" to defeat such interpretation and to adopt the construction favored by the insurance company. See id.

In this line of the majority's reasoning, it is not clear whether the phrase "reasonable expectations" is being used in a colloquial or a technical sense, given it is an insurance-law term of art. The majority's expression appears aimed at employing contract principles pursuant to a reasonable-expectations theory, whereas that rubric originated as a means of avoiding what contract precepts would otherwise dictate.[3] In all events, again, resolving any perceived ambiguity in favor of the insurance company is in tension with the established precept that ambiguities in insurance policies generally are to be construed in favor of the insured.[4]

---

[3] See, e.g., Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 584-95, 388 A.2d 1346, 1348-54 (1978); Brakeman v. Potomac Ins. Co., 472 Pa. 66, 72, 371 A.2d 193, 196 (1977). See generally Robert E. Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 HARV. L. REV. 961, 967 (1970) (suggesting that giving effect to an insured's expectations is reasonable, "even though painstaking study of the policy provisions would have negated those expectations," because insurance policies are contracts of adhesion drafted by the insurer or an insurance industry organization); Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034, 1042 n.12 (D.C. Cir. 1981) (same).

[4] The majority suggests that LPH Plumbing and Penn National jointly drafted the policies. See Majority Opinion, slip op. at 37 (referencing the time "[w]hen LPH Plumbing and Penn National drafted the Penn National policies"). However, the policies – which were introduced into the record as trial exhibits, see N.T., June 10, 2010, at 13-14 – appear to be standard form insurance policies issued by Insurance Services Office, Inc., see R.R. 387a-402a, 405a-428a, with the identity of the insured, the policy limits, and the coverage periods reflected on separate declarations pages. See id. at 381a-386a, 403a-404a.

More importantly, I am not as certain as the majority that the multiple-trigger concept cannot have any application in the scenario presently before the Court. One of our sister States has found the theory to obtain in a very similar situation, see Wis. Elec. Power Co. v. Cal. Union Ins. Co., 419 N.W.2d 255, 258 (Wis. Ct. App. 1987) (applying the multiple-trigger concept where a herd of dairy cows was harmed over a twelve-year period by stray voltage from a nearby power plant), and it has been utilized, albeit sometimes under a "continuous occurrence" label, in fairly analogous situations involving environmental pollution – where, like here, the cause of damage is hidden and the damage itself is progressive and continuous.[5]

I also do not find the majority's attempt to distinguish or limit J.H. France entirely convincing. The majority does not analyze J.H. France on its terms, but observes that the decision referenced Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C. Cir. 1981). The majority then notes that Keene identified a policy consideration arising in asbestos litigation that does not directly pertain in the current matter – namely, that application of the first-manifestation rule could result in mass cancellation of insurance policies. There is nothing in J.H. France, however, that can reasonably be construed as limiting the decision to circumstances in which mass policy cancellation might otherwise occur. Indeed, although J.H. France cites and quotes several

---

[5] See, e.g., Pub. Serv. Co. of Colo. v. Wallis & Cos., 986 P.2d 924, 935 (Colo. 1999); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 670 N.E.2d 740, 750 (Ill. Ct. App. 1996); Boston Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 316 (Mass. 2009); EnergyNorth Natural Gas v. Certain Underwriters at Lloyd's, 934 A.2d 517, 522 (N.H. 2007); cf. Mo. Pac. R.R. Co. v. Int'l Ins. Co., 679 N.E.2d 801, 807 (Ill. Ct. App. 1997) (employing the "continuous occurrence" rubric where workers suffered hearing loss attributable to many years of exposure to high noise levels).

passages of <u>Keene</u>, it does not cite, quote, or even mention the portion of <u>Keene</u> on which the majority presently relies.[6]

Finally, and perhaps most importantly in terms of my position that the case should be dismissed, I am not sure that the "multiple triggers" rubric represents the most appropriate overlay for the argument that, per their policy terms construed in accordance with applicable rules of contract construction, coverage was available to Appellants under multiple Penn National policies. In this regard, again, I believe that the Court's application of ordinary principles is negatively impacted by the manner in which this appeal has evolved.

---

[6] In an opinion approved by this Court, the Superior Court identified the public-policy aspect of <u>Keene</u> as representing an important basis supporting the multiple-trigger rule in latent disease cases. <u>See</u> <u>Consulting Eng'rs, Inc. v. Ins. Co. of N. Am.</u>, 710 A.2d 82, 87 (Pa. Super. 1998), <u>aff'd</u> <u>on</u> <u>basis</u> <u>of</u> <u>Superior</u> <u>Court</u> <u>opinion</u>, 560 Pa. 247, 743 A.2d 911 (2000) (per curiam). However, <u>Consulting Engineers</u> did not suggest that latent diseases are the <u>only</u> types of scenarios in which the rule could ever apply. Indeed there was no need in that matter to identify the contours of the doctrine since a single point in time was easily ascertainable as the moment when all of the damage was inflicted. As such, I do not read <u>Consulting Engineers</u> as foreclosing application of the multiple trigger doctrine more widely than in the asbestos arena.