# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*John Crane, Inc. v. Admiral Insurance Co.*, 2013 IL App (1st) 093240-B

| | |
|---|---|
| Appellate Court Caption | JOHN CRANE, INC., Plaintiff-Appellant and Cross-Appellee, v. ADMIRAL INSURANCE COMPANY, AMERICAN MOTORISTS INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, HARTFORD ACCIDENT AND INDEMNITY, LUMBERMENS MUTUAL CASUALTY COMPANY, and TWIN CITY FIRE INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYDS OF LONDON, and CERTAIN LONDON MARKET INSURANCE COMPANIES, Including Excess Insurance Company, Ltd., General Reinsurance Corporation, River Thames Insurance Company, World Auxiliary Insurance Corporation, and John Does 1 Through 400, Defendants (Allianz Underwriters Insurance Company, Allstate Insurance Company, AIU Insurance Company, American Re-Insurance Company, Granite State Insurance Company, Lexington Insurance Company, National Surety Corporation, National Union Fire Insurance Company of Pittsburgh, PA, Insurance Company of North America, and TIG Insurance Company, Defendants-Appellees; Columbia Casualty Company, Continental Casualty Company, and The Continental Insurance Company, Defendants-Appellees and Cross-Appellants). |
| District & No. | First District, Second Division<br>Docket No. 1-09-3240 |
| Filed | June 4, 2013 |

**Held**

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

In a complex action arising from a dispute over the primary, excess and umbrella insurance coverages for asbestos-related claims against plaintiff, the trial court properly held that the horizontal exhaustion doctrine required plaintiff to prove that all of its primary policy limits were exhausted before any umbrella and excess insurers had to contribute, regardless of the agreement under which plaintiff and its primary insurer attempted to renegotiate those limits in view of plaintiff's no-settlement policy with regard to asbestos claims, all triggered excess or umbrella policies would be jointly and severally liable, and plaintiff would not be required to prove all three of the triggers for asbestos coverage outlined in *Zurich*; rather, coverage would be triggered by proof of exposure, sickness or disease.

**Decision Under Review**

Appeal from the Circuit Court of Cook County, No. 04-CH-08266; the Hon. Dorothy Kirie Kinnaird, Judge, presiding.

**Judgment**

Affirmed in part and reversed in part; cause remanded with directions.

**Counsel on Appeal**

Kevin M. Forde, Ltd. (Kevin M. Forde and Joanne R. Driscoll, of counsel), Nisen & Elliott LLC, both of Chicago (Michael J. Daley and Claire E. Gorman, of counsel), and Farella Braun & Martell, LLP, of San Francisco, California (John L. Cooper, Dennis M. Cusack, and Erica Villanueva, of counsel), for appellant.

Troutman Sanders LLP (Rebecca L. Ross, Clinton E. Cameron, David F. Cutter, and Stephanie L. Haas, of counsel), Bates Carey Nicolaides, LLP (Catherine M. Crisham, Kristi S. Nolley, Ellen J. Zabinski, and Agelo L. Reppas, of counsel), SmithAmundsen LLC (Timothy J. Fagan and Michael L. Resis, of counsel), Clausen Miller P.C. (Mary F. Stafford, Colleen A. Beverly, and Melinda S. Kollross, of counsel), Cozen & O'Connor (John D. LaBarbera, of counsel), and Hughes Socol Piers Resnick & Dym, Ltd., all of Chicago (Robert R. Anderson III, John Hughes, and Daniel A. Waitzman, of counsel), for appellees.

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Quinn and Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff John Crane, Inc. (Crane), appeals the circuit court's judgment on its first amended complaint against defendants Columbia Casualty Company, Continental Casualty Company, Continental Insurance Company (collectively referred to as CNA), TIG Insurance Company (TIG), Allianz Underwriters Insurance Company, Munich Reinsurance America, Inc., f/k/a American Re-Insurance Company, National Surety Corporation (collectively referred to as Allianz), Allstate Insurance Company, and AIU Insurance Company, Granite State Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA (collectively referred to as AIG-related Companies), seeking a declaration of rights.[1] On appeal, Crane contends the trial court erred in (1) finding that the parties could not use the agreement concerning coverage (ACC) to determine that Kemper's primary policies had been exhausted by November 2004; (2) determining that a *pro rata* allocation of payments by excess and umbrella insurers applies, rather than an "all sums" allocation; and (3) finding that *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), requires Crane to prove all three trigger dates to prove exhaustion of its primary policies. CNA defendants also filed a cross-appeal in which it alleges that the trial court erred in (1) determining that mere exposure to asbestos constitutes bodily injury under *Zurich*; and (2) failing to adopt an equitable continuous trigger.

¶ 2    In an opinion filed on March 5, 2013, this court affirmed the trial court in part, reversed in part and remanded with directions. The CNA and Allianz defendants filed petitions for rehearing, which this court granted. Crane filed a response and the CNA and Allianz defendants filed their replies. Upon consideration of the petitions for rehearing, we issue the following opinion and affirm in part, reverse in part and remand with directions.

¶ 3                                     JURISDICTION

¶ 4    The circuit court entered an order on November 13, 2009, resolving all claims pled in Crane's first amended complaint, and all but one of defendants' counterclaims. The order stated that there was "no just reason for delaying either enforcement or appeal." Crane filed a notice of appeal on November 25, 2009. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 304(a) governing appeals that do not dispose of an entire

---

[1]Other defendants are not parties to this appeal or cross-appeal.

proceeding. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010).[2]

¶ 5                                    BACKGROUND

¶ 6         The trial court in this matter presided over intensive discovery, heard more than 25 summary judgment motions, and conducted two trials during a period of almost five years. It issued six detailed memorandum opinions and orders, and the record contains over 200 volumes. We have set forth only those facts necessary to resolve the issues on appeal and cross-appeal.

¶ 7         Crane manufactures sealing systems and prior to 1986, it manufactured gaskets containing asbestos. From January 1, 1944, through August 1, 2001, Crane purchased primary insurance coverage from Kemper, which is not a party to this appeal. These policies contained a duty to defend and provided that defense costs would be paid in addition to the policy limits. The parties to this appeal stipulated that the limits of Kemper's primary policies totaled $41,075,000.

¶ 8         Crane also purchased umbrella insurance coverage above the primary coverage. CNA issued umbrella policies to Crane from 1961 to 1967, and from 1978 to 1981. Allianz issued an umbrella policy for the period between November 30, 1981, to November 30, 1982, and TIG issued an excess policy above Allianz's umbrella policy for that same period. Kemper also issued three umbrella policies to Crane above its primary insurance from 1967 to 1977.

¶ 9         Since 1979, Crane has been named as a defendant in over 250,000 asbestos-related bodily injury claims throughout the United States. Kemper began defending Crane in these suits and agreed to adopt a no-settlement policy based on Crane's position that their products were not the likely source of the victims' asbestos-related disease. In 2001, facing financial difficulty, Kemper attempted to renegotiate the no-settlement policy with Crane. On January 7, 2002, the parties entered into the ACC. The purpose of the ACC was to resolve "the questions and issues addressed herein relating to the existence and handling of coverage for John Crane for Asbestos-Related Claims." The ACC addressed retroactive amendments to Kemper's primary policies issued from January 1, 1987 to August 1, 2001 (post-1986 policies). Crane did not have umbrella or excess insurance coverage by defendant insurers for this period. The ACC provided that although the original policies issued by Kemper allowed only for indemnity payments to erode the policy limits, the retroactive amendments provided that the post-1986 policy limits would be eroded by payments of both damages and defense expenses. As the trial court stated in its October 16, 2007, order, "the Post-1986 Policies' limits changed from $2 million per year plus unlimited defense to $2 million per year including defense." The ACC further provided that Kemper issue a new $70 million supplemental

_____

[2]In its appellee brief, CNA raises the issue that this court lacks jurisdiction to consider Crane's appeal because a prior appeal was dismissed for failure to prosecute. Although this court had filed a judgment on July 19, 2011 and August 30, 2011, dismissing the appeal for lack of jurisdiction, the supreme court issued a supervisory order directing this court to vacate its order and "reinstate the appeal, and to consider the case on the merits." *John Crane, Inc. v. Admiral Insurance Co.*, No. 113200 (Ill. Jan. 11, 2012) (supervisory order).

excess policy (SEP) to Crane and that Kemper agreed to continue with the no-settlement strategy.

¶ 10    On January 7, 2002, the parties also entered into the Caruolo agreement, which involved a case originating in New York. The dispute centered on the payment of $5.83 million in prejudgment interest in the case. The agreement provided that the payment could be allocated against Kemper's pre-1987 policy limits in exchange for $5 million being added to the limits of the post-1986 Kemper policies.

¶ 11    Crane filed a claim for declaratory judgment in May 2004. On October 22, 2004, it filed its first amended complaint containing three counts. Count I sought a declaration that Crane's primary insurance coverage was exhausted. Counts II and III sought a declaration of the obligations of the umbrella and excess insurance carriers as to the underlying asbestos claims. CNA filed a counterclaim for declaratory judgment, seeking a determination of the appropriate triggers for coverage, that CNA is entitled to a *pro rata* allocation of payments, and that Crane's primary coverage limit had not been exhausted.

¶ 12    In February 2005, citing *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987), Crane filed a motion for partial summary judgment arguing that an "all sums" allocation of payments is appropriate whereby each umbrella policy triggered by a claim must pay up to its policy limits. CNA filed a response claiming an affirmative defense. Allianz filed a cross-motion arguing, in part, that the "all sums" allocation was contrary to the terms of its umbrella policy and was not equitable as applied to umbrella insurers. On April 12, 2006, the trial court issued an order determining that a *pro rata* allocation applied to the excess and umbrella carriers, pointing out that *Zurich* involved only primary insurers. The court denied Crane's motion for partial summary judgment on count I of its first amended complaint seeking an "all sums" allocation. The court granted Allianz's cross-motion for partial summary judgment on the issue of *pro rata* allocation and CNA's affirmative defense in seeking a *pro rata* allocation.

¶ 13    The trial court also found that, regarding the ACC, Crane and Kemper could retroactively amend their post-1986 policies without consulting nonprimary insurers because none of those insurers issued policies to Crane after 1986. In the trial court, Kemper and Crane argued that under the terms of the ACC, Kemper's primary insurance was exhausted in November 2004. The trial court, however, decided that it could not rule on this issue until it determined the validity of the ACC and resolved issues of good faith and intent of the parties in entering the agreement. The court also directed the parties to brief the issue of severability of the agreement in case one or more provisions proved invalid.

¶ 14    The trial court subsequently found that sections five and six of the ACC, which deal specifically with issues of trigger, allocation, and cost recovery from other insurers, were severable. It determined that the "core purpose" of the ACC was to resolve the no-settlement strategy issue between Kemper and Crane, and the parties would have entered into the agreement even without those provisions.

¶ 15    The trial court also decided that it would hold an exhaustion trial in the future to determine whether Kemper's primary policies had been exhausted. If, during the exhaustion trial, sections five and six were found to be void, those sections could be severed without

affecting the rest of the ACC. The trial court concluded that "Crane may use the ACC in demonstrating exhaustion at the Exhaustion Trial. Whether the primary layer of coverage is exhausted will be determined after the Exhaustion Trial based upon the principles of the doctrine of horizontal exhaustion."

¶ 16    After the trial court issued its April 12, 2006, order, certain excess carriers including TIG filed a joint motion to extend the court's ruling adopting a *pro rata* allocation to their excess policies. The trial court granted their motion on June 21, 2006.

¶ 17    On October 30, 2006, Crane and Kemper entered into another agreement (2006 settlement). Crane agreed to release Kemper from all potential remaining obligations under its primary policies and its umbrella policies for a lump sum totaling more than $20 million. The 2006 settlement also contained a provision in which Crane agreed to undertake any obligations Kemper would have had under the primary policies. As the trial court noted, "Crane concedes that as a result of the 2006 Settlement, Crane stands in the shoes of Kemper."

¶ 18    On October 16, 2007, the trial court issued an order that determined whether Crane, in standing in the shoes of Kemper, may rely on policy limits as established by the ACC to prove exhaustion, or whether it was obligated to prove exhaustion of Kemper's original policy limits. Relying on *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598 (1994) (hereinafter *U.S. Gypsum*), *AAA Disposal Systems, Inc. v. Aetna Casualty & Surety Co.*, 355 Ill. App. 3d 275 (2005), *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 368 Ill. App. 3d 665 (2006) (*Kajima I*), and *North River Insurance Co. v. Grinnell Mutual Reinsurance Co.*, 369 Ill. App. 3d 563 (2006), the trial court held that the horizontal exhaustion doctrine applied. The doctrine is based on the "other insurance" provision of excess insurer policies, which "require[ ] the insured to exhaust all triggered primary insurance before pursuing coverage under the excess policies." The trial court cited the above cases to support its finding that insureds cannot "choose to make policies unavailable" for application of the horizontal exhaustion doctrine.

¶ 19    The trial court reasoned that Crane's argument "assert[s] that Kemper's original policy limits are unavailable for purposes of exhaustion because of the ACC [*sic*] and the 2006 Settlement retroactively amended the Post-1986 Policies and it is those amendments that control." Therefore, "the original policies' limits of liability are no longer available." The court held that "Crane cannot make the original limits of liability to primary insurance unavailable simply by retroactively amending policy terms. *** [I]n order for the umbrella or excess coverage to be triggered, the insured must show that the full limits of the policies as originally written are exhausted." The original limits on these policies were $2 million per year excluding defense costs.

¶ 20    On December 20, 2007, after holding a medical trial, the trial court confirmed the continued applicability of "*Zurich*'s holding that exposure to asbestos constitutes bodily injury and thus, the policies in effect during the exposure years are triggered." It rejected Crane's argument for a continuous trigger because after presentation of the evidence the court could not "conclude that in every case there is a progression of continuing body injury between the time a claimant's exposure to asbestos ceases and the time the claimant is

diagnosed with the disease." Therefore, the trial court applied *Zurich*'s triple trigger. "Insurance policies in effect during the years of exposure, during the years of sickness, and during the years of manifestation (through duration) of the disease will be triggered." However, it determined that "any mutations that may occur between the last day of exposure and the first day of symptoms[ ] do not constitute a new injury or sickness to which the policies must respond."

¶ 21     The trial court's orders up to this point determined that (1) there was a single occurrence; (2) it would use *Zurich*'s triple trigger to determine exhaustion of Kemper's primary policies; (3) the doctrine of horizontal exhaustion applied; and (4) Crane must "stand in the shoes" of Kemper in demonstrating exhaustion of the primary policies as they were originally issued. The trial court set a date for a bench trial (exhaustion trial) to determine whether Crane sufficiently proved that payments of the first 67 claims exhausted Kemper's primary policies in effect from 1944 to 2001.

¶ 22     The parties stipulated to Kemper's original primary policy limits of $41,075,000 and that payments of $37,065,259 have been made on 54 of the 67 claims at issue. The 13 payments in dispute total $14,804,583. Prior to trial, Crane presented two witnesses who testified as to the disputed payments. The disputes centered on the "amount paid and the amount allocated for indemnity or prejudgment interest or delay damages." After presentation of the evidence, the trial court determined that Crane failed to prove six of the disputed payments, totaling $8,832,467.

¶ 23     At the exhaustion trial, Crane had the burden of proving trigger dates and allocation. In its memorandum opinion and order of March 10, 2009, the trial court outlined the following facts. Crane presented Mr. Jones as its sole expert witness. Mr. Jones testified as to the trigger dates, allocation of the 67 adverse asbestos claims at issue, and to what extent Kemper's primary policies were exhausted by payments of these claims. Although the discovery process yielded 500 boxes of documents, CNA's counsel, along with consultant Dr. Anne Gron, reduced the documents used to four boxes. CNA did not retain Dr. Gron as an expert witness and no one with first-hand knowledge testified at trial as to the reduction process. The trial court noted that although this is the third time Mr. Jones has testified about insurance allocations, it "is the first time he testified where he did not participate in, collect, or supervise the collection of the data that supports his allocation. This is also the first time that Mr. Jones has testified to an insurance allocation based upon data collected by opposing counsel and opposing counsel's experts."

¶ 24     The trial court found that Mr. Jones' allocations suffered from "methodological and procedural defects" such that he "did not complete, participate in, or supervise a true, independent, expert review of the underlying claim materials." The trial court specifically noted four areas of concern. "First, Mr. Jones did not seek to determine or independently confirm whether the four boxes were a representative or relevant sample of the universe of 500 boxes. *** Second, Mr. Jones relied on everything in the four boxes without question [as to their reliability or trustworthiness]." Third, Mr. Jones used Dr. Gron's dates even though he had never spoken to or met her. Although he knew that she had not previously performed an insurance allocation, he accepted her dates "the majority of the time *** even in those instances when the document or his protocol dictated that he should select another

-7-

date." Fourth, Mr. Jones only reviewed materials contained in the four boxes selected by CNA's counsel and Dr. Gron because he was instructed to do so by Crane's counsel. Mr. Jones testified that he would have reviewed the entire 500 boxes of material if asked to do so. The trial court also found that some of the documents relied upon by Mr. Jones were untrustworthy and unreliable.

¶ 25    The trial court also found that Crane did not satisfy its burden of proving that Kemper's primary policies had been exhausted by the 67 claims. It reasoned that Crane's expert, Mr. Jones, was not credible given the limitations Crane imposed on him and his allocation "was based on incomplete information which the Court found to be largely untrustworthy." Therefore, reliable trigger dates could not be ascertained from Mr. Jones' testimony and Crane could not prove whether certain primary policies were triggered for coverage. Since Crane did not prove exhaustion of the primary policies, defendants at this time "have no coverage obligations to Crane under their respective umbrella and excess policies. Under these circumstances, the Court need not reach the legal issues raised by the parties nor address the relief request in" defendants' counterclaims.

¶ 26    However, the trial court did find that the claim of Bernard Mayer was sufficiently proved. The parties stipulated to the exposure, sickness, and diagnosis dates. Therefore, the trial court determined that "[t]he Kemper primary policies in effect from January 1, 1944, to December 31, 1944, and from January 1945 to December 31, 1945, are eroded by the stipulated paid indemnity of $1,329,795 to the Mayer claim on a *pro-rata* allocation."

¶ 27    The trial court also addressed CNA's motion to reconsider its ruling in the medical trial that *Zurich*'s triple trigger applied. Citing as support cases from New York[3] and England, CNA asked the trial court "to hold that (1) mere exposure does not constitute 'bodily injury;' (2) there is no 'bodily injury' for mesothelioma claims more than six years before death; (3) there is no 'bodily injury' for lung cancer more than 10 years from symptoms or death; and (4) Crane may use the legal fiction of an 'equitable continuous trigger' in the absence of proof on the timing of actual injury for non-malignant claims." The CNA argued that the New York and English cases "reflect a growing consensus that mere exposure does not constitute bodily injury for insurance purposes." The trial court denied the request, finding that the CNA presented no newly discovered evidence, change of law, or errors in the court's earlier application of the law. Crane filed this timely appeal and CNA filed a cross-appeal.

¶ 28                                ANALYSIS

¶ 29    As an initial matter, we address TIG's motion to strike portions of Crane's opening brief which we have taken with the case. TIG argues that Crane's use of 30 footnotes, many of which contain substantive arguments, violates Illinois Supreme Court Rule 341(a) (eff. July 1, 2008). TIG also contends that Crane violated Illinois Supreme Court Rules 341(h)(2) and (6) (eff. July 1, 2008) by misstating the facts and including arguments in its introductory paragraph. TIG requests that this court strike all footnotes, as well as any misstatements and

---

[3]*Continental Casualty Co. v. Employers Insurance Co. of Wausau*, 865 N.Y.S.2d 855 (N.Y. Sup. Ct. 2008).

misplaced arguments. We acknowledge TIG's position that substantive arguments belong in the body of the brief, and its concern that Crane was attempting to evade the 70-page limit set by this court. We also note that the case involves complex issues and numerous motions from Crane and defendants. We deny TIG's motion to strike portions of Crane's opening brief. However, we will disregard any inappropriate or unsupported material, and any substantive arguments contained only in the footnotes. *Tekansky v. Pearson*, 263 Ill. App. 3d 759, 763 (1994); *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 171 (2008).

¶ 30    TIG also argues that Crane waived consideration of the language in its excess policy because Crane did not specifically address TIG's policy in the trial court. TIG further argues that in its brief Crane requested reversal of the trial court's *pro rata* ruling in favor of umbrella carriers but neglected to mention excess carriers. Therefore, Crane waived the issue as to excess carriers such as TIG. These issues of law have been fully briefed by the parties on appeal. It is also reasonable to presume that Crane's failure to include excess carriers in its *pro rata* issue was a minor error in a complex case. The waiver rule "is a limitation on the parties and not the jurisdiction of the courts." *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 11 (1996). Therefore, we choose to address these issues on the merits.

¶ 31                                  I. ACC

¶ 32    Crane first contends that the trial court erred in finding that the parties could not use the ACC to determine that Kemper's primary policies had been exhausted by November 2004. Crane argues that if this court finds that the ACC properly amended the limits of Kemper's primary policies, defendants concede that exhaustion occurred in November, 2004. This concession is found in the CNA defendants' reply to its motion for partial summary judgment seeking a declaration that Crane must stand in the shoes of Kemper and the original policy limits in proving exhaustion of the primary policies. Therein, CNA states a position it might take for the sake of argument if the trial court finds in favor of Crane on the ACC issue. CNA noted that "even without the ACC, under a *Zurich v. Raymark* trigger, Crane can demonstrate that exhaustion occurred by November, 2004." However, in the accompanying footnote CNA explicitly states that "[i]f the Court's judgment is overturned on appeal, the CNA Defendants reserve the right to argue that the ACC is not in good faith and that exhaustion has not occurred." Therefore, defendants did not concede without qualification that Crane has proved exhaustion under the ACC and we will address this issue on the merits.

¶ 33    On appeal, the main point of contention between the parties regarding the ACC is whether its provision allowing previously excluded defense costs to erode the policy limits applies to prove exhaustion, or whether the original policy limits still apply. In its April 12, 2006, order the trial court found that Kemper and Crane could enter into an agreement (ACC) retroactively amending Kemper's post-1986 policies, since no excess insurers issued policies to Crane after 1986 and their rights therefore were not affected. The trial court questioned the validity of sections five and six of the ACC, but determined in its November 20, 2006, order that those sections are severable without affecting the remainder of the ACC and other agreements. It further determined that "Crane may use the ACC in demonstrating exhaustion at the Exhaustion Trial. Whether the primary layer of coverage is exhausted will

be determined after the Exhaustion Trial based upon the principles of the doctrine of horizontal exhaustion." In 2004, Crane agreed to fully release Kemper's liability under its primary policies in exchange for payment of $10 million. In 2006, Crane entered into a second settlement agreement, releasing Kemper from all remaining obligations under both its primary and excess policies. Both settlements provided that the ACC was still in effect. See *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 696 (2009).

¶ 34    In challenging the validity of the ACC on appeal, CNA defendants argue only that Kemper and Crane did not enter into the ACC in good faith. Instead, the ACC was intended "to result in the premature exhaustion of the Kemper primary policies to the prejudice of the excess carriers." In alleging a bad-faith claim, defendants must show that Kemper and Crane owed the excess insurers a duty to act in good faith. See *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 417 (2001) ("[t]o survive a motion to dismiss a bad-faith claim, the plaintiff must allege facts sufficient to establish the existence of the duty to settle in good faith"). Whether a duty exists under a particular set of facts is a question of law for the courts to decide. *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 116 (1995).

¶ 35    The duty to settle in good faith arises "when a claim has been made against the insured and there is a reasonable probability of recovery in excess of policy limits and a reasonable probability of a finding of liability against the insured." *Haddick*, 198 Ill. 2d at 417. Furthermore, the duty does not arise until a third party "demands settlement within policy limits." *Id*. In the case at bar, the injured parties' demands for settlement greatly exceed the primary policy limits. Therefore, pursuant to *Haddick*, no plausible claim of bad faith can be made against Kemper and Crane. Both the trial court and CNA defendants rely on *Schal Bovis, Inc. v. Casualty Insurance Co.*, 314 Ill. App. 3d 562 (1999), to support the position that primary insurers owe a duty to excess insurers to act in good faith. However, *Schal Bovis* involved an action filed by an excess insurer against four primary insurers which had refused to settle an action against the insured for an amount under the primary policies' limits. The appellate court held that an excess carrier may bring a cause of action against a primary carrier for bad-faith refusal to settle. *Schal Bovis*, 314 Ill. App. 3d at 571. As in *Haddick*, *Schal Bovis* only concerned an alleged bad faith refusal to settle.

¶ 36    All appellee insurers complain that Kemper and Crane refused to settle claims made against Crane even when they were well founded. However, as previously pointed out, Crane has been named as a defendant in over 250,000 asbestos-related bodily injury claims throughout the United States. Further, at the exhaustion trial, the parties stipulated that Kemper had primary policy limits of $41,750,000 for the period from 1944 to 2001. Under the circumstances, it cannot plausibly be argued that Crane and Kemper's no-settlement policy resulted in the policies of the umbrella or excess insurance carriers being prematurely implicated due to Crane's and Kemper's bad-faith refusal to settle. Consequently, neither *Haddick* nor *Schal Bovis* supports appellees' arguments.

¶ 37    Crane asserts that Kemper and Crane entered the ACC to address issues arising from Kemper's defense of Crane in the underlying asbestos litigation. The ACC amended Kemper's post-1986 primary policies to include previously excluded defense costs in the policy limits, and to establish Kemper's commitment to a no-settlement strategy. Crane argues that parties to an insurance contract may amend the terms of the policy, and the excess

carriers are not parties to the insurance contract between Kemper and Crane, or to the ACC. Furthermore, there is no evidence that the umbrella or excess carriers relied on any representations made by Crane or Kemper after 1986. See *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 1000-01 (2005). Crane argues that the excess carriers therefore lack "contractual standing to object to the ACC's defense cost terms relating to Kemper's post-1986 policies." Crane argues that the trial court correctly determined that "Crane may use the ACC in demonstrating exhaustion."

¶ 38 We are not persuaded by Crane's contention that the excess carriers lack standing to object to the ACC. "The doctrine of standing ensures that issues are raised only by parties having a real interest in the outcome of the controversy." *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 35. A party demonstrates standing by showing some injury to a legally cognizable interest. *Id*. The ACC explicitly amended the limits of Kemper's primary policies from $2 million per year excluding defense costs to $2 million per year including defense costs. This change in the primary policy limits clearly affects a legally cognizable interest of the excess and umbrella insurers.

¶ 39 The trial court determined whether policy limits under the original policies or under the policies as amended by the ACC applied to prove exhaustion. Pursuant to the 2006 settlement agreement, Crane released Kemper from all potential remaining obligations under Kemper's primary and umbrella policies for a lump-sum payment. In return, Crane agreed to undertake any obligations Kemper might have had under the policies. The trial court determined that although Crane could use the ACC to show exhaustion, it was responsible for the limits as provided for in Kemper's original policies, not as amended by the ACC or the settlement agreement.[4] It based its determination on the doctrine of horizontal exhaustion, citing *U.S. Gypsum*'s language that the insured "must exhaust all available primary coverage before proceeding against an excess carrier when that carrier's policy contains an 'other insurance' clause." *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 654 (1994). The trial court concluded that the horizontal exhaustion doctrine does not allow an insured and its primary insurer to make the original policy limits unavailable simply by entering into agreements that retroactively amend the policies.

¶ 40 Our supreme court addressed the horizontal exhaustion doctrine most recently in *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102 (2007) (*Kajima II*). The underlying claim in *Kajima* involved a worker injured on a construction site. The worker sued the general contractor, Kajima. Kajima tendered the claim to St. Paul Fire & Marine Insurance Company. St. Paul eventually paid $2 million of the $3 million settlement. Kajima also had a primary commercial general liability (CGL) policy with Tokio Marine & Fire Insurance. Tokio paid its $1 million policy limits as part of the settlement. Tokio and Kajima then filed a declaratory judgment action against St. Paul seeking reimbursement of the $1 million, arguing that Kajima's selective tender of the entire claim

---

[4]The 2006 settlement agreement states that the applicable limits of Kemper's primary policies "have been exhausted" and payments of approximately $60 million have been made under Kemper's excess policies.

to St. Paul made the Tokio policy unavailable.

¶ 41    The appellate court affirmed the circuit court's entry of summary judgment for St. Paul and against Tokio. In doing so, the appellate court held:

> "The requirement of horizontal exhaustion has been addressed and applied by Illinois courts on several occasions. *United States Gypsum*, 268 Ill. App. 3d at 598; *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630, 642-43 (1996); *Roman Catholic Diocese of Joliet, Inc. v. Lee*, 292 Ill. App. 3d 447, 456-57 (1997); *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69, 80-81 (1997); *Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur*, 317 Ill. App. 3d 737, 753 (2000); *Maremont Corp. v. Continental Casualty Co.*, 326 Ill. App. 3d 272, 279-80 (2001). In each case, this court held that the insured must first exhaust all available primary insurance coverage, including uninsured periods and self-insured periods, before an excess policy could be invoked." *Kajima I*, 368 Ill. App. 3d at 670.

¶ 42    In affirming the appellate court, the supreme court discussed the nature of excess insurance and the horizontal exhaustion doctrine, which "originated in cases involving a continuous tort or long-term environmental and hazardous waste claims." *Kajima II*, 227 Ill. 2d at 113. The court explained that "when excess insurance exists as part of an overall insurance package, it provides a secondary level of coverage to protect the insured where a judgment or settlement exceeds the primary policy's limits of liability. [Citation.] Excess insurance coverage attaches only after a predetermined amount of primary insurance or self-insured retention has been exhausted. [Citation.] Consequently, until the limits of primary coverage are exhausted, secondary coverage does not provide any collectible insurance. [Citation.] Once an excess policy is triggered in a case, the limits of the primary insurance must be exhausted before the excess carrier will be required to contribute to a settlement or judgment." (Internal quotation marks omitted.) *Kajima II*, 227 Ill. 2d at 114-15. Further, citing the holding in *U.S. Gypsum*, the court explained that excess policies may provide that they are excess to " 'all triggered primary policies, regardless of whether they extend over multiple policy periods or only one.' " (Emphasis omitted.) *Kajima II*, 227 Ill. 2d at 114 (quoting *U.S. Gypsum*, 268 Ill. App. 3d at 653). The holding in *Kajima II* fully supports the trial court's ruling that, at the exhaustion trial, Crane had to prove that Kemper (and therefore Crane) had exhausted all the triggered primary policies before the umbrella or excess carriers would be required to contribute to any settlement or judgment.

¶ 43    Crane argues that as the appellee umbrella and excess insurers did not provide coverage for periods after 1986 and they did not rely on any representations made by Crane or Kemper after 1986, they cannot accuse Crane or Kemper of bad faith for entering into the 2002 ACC. Indeed, Crane argues that the umbrella and excess carriers greatly benefitted by Kemper providing primary and excess insurance to Crane after 1986. This argument, although factually true, misses the point. As explained in *Kajima II*, the horizontal exhaustion doctrine requires Crane to prove that all of the triggered primary policies had been exhausted before the umbrella or excess carriers could be required to contribute to any settlement or judgment. Crane fails to cite any case for the proposition that, after a primary policy has been triggered, an insured and a primary insurer may make an agreement which lessens the amount of primary insurance required to be exhausted before umbrella or excess insurance policies are

-12-

implicated. In the trial court, Crane argued that, as of their 2004 settlement agreement with Kemper, not only were all primary insurance policies triggered, they were exhausted. Crane, however, made no argument that any of its primary policies were not triggered at the time they entered into the ACC. We affirm the trial court's holding that the horizontal exhaustion doctrine requires Crane to prove that all of Kemper's primary policy limits, as written before the parties entered into the ACC, were exhausted before the umbrella or excess carriers would be required to contribute to any settlement or judgment.

¶ 44                                    II. *Pro Rata* Allocation

¶ 45    Crane next contends that the trial court erred in holding that the excess insurers could utilize a *pro rata* allocation in determining the amount for which each carrier is liable. Crane argues that the holding in *Zurich* requires that each excess carrier be held jointly and severally liable for all judgments arising during any excess policy period.

¶ 46    The policies at issue in *Zurich* provided:

" 'I. COVERAGE A–BODILY INJURY LIABILITY

***

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury ***

***

*** caused by an occurrence ***.' " *Zurich*, 118 Ill. 2d at 33.

The policies also set forth the following definitions:

" ' " bodily injury" means bodily injury, sickness or disease ***.

***

"occurrence" means an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury *** neither expected nor intended from the standpoint of the insured.' " *Zurich*, 118 Ill. 2d at 33.

¶ 47    The court held:

" 'Bodily injury,' which gives rise to the insurer's duties under the policies, is defined as 'bodily injury, sickness or disease.' The circuit court and the appellate court correctly concluded that these terms must be read as separate and distinct triggers of coverage. Thus, under the plain and unambiguous language of the policies, an insurer must provide coverage for a claim if the claimant sustained 'bodily injury' or 'sickness' or 'disease' during the policy period. Having concluded that each of these events triggers coverage, the inquiry becomes when 'bodily injury,' as defined in the policy, occurs.

* * *

*** The evidence in the record amply supports the circuit court's finding that 'bodily injury' occurs when asbestos fibers are inhaled and retained in the lung. We therefore conclude that an insurer whose policy was in force at the time a claimant was exposed to asbestos must provide coverage of that claim.

-13-

As we have already noted, 'sickness' and 'disease' are included within the policy definition of 'bodily injury,' and therefore, also trigger coverage." *Zurich*, 118 Ill. 2d at 44-45.

¶ 48 Zurich asked the supreme court to adopt the *pro rata* approach set forth in *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), *aff'd on rehearing*, 657 F.2d 814 (6th Cir. 1981). The appellate court had rejected this argument, finding that nothing in the policy language permitted proration. The supreme court held:

"In *Forty-Eight Insulations*, the court held that the insurers' obligations under their respective policies were triggered only by a claimant's exposure to asbestos during a policy period. From this premise, that court concluded that the exposure theory provided a reasonable means of allocating the costs of defense and indemnification among the triggered policies based on the number of years of exposure. As already noted, unlike *Forty-Eight Insulations*, this court has held that an insurer must afford Raymark coverage of a claim if the claimant suffers bodily injury *or* sickness *or* disease during a policy period. Having rejected the premise underlying the *pro rata* allocation approach adopted in *Forty-Eight Insulations*, we conclude that the appellate court did not err insofar as it declined to order the *pro rata* allocation of defense and indemnity obligations among the triggered policies." (Emphases in original.) *Zurich*, 118 Ill. 2d at 57.

¶ 49 Before us, the appellee insurers argue that *Zurich* did not preclude the trial court from applying the *pro rata* time-on-the-risk allocation method in determining the amount owed by the excess insurers to the insured as damages. The appellees rely on several appellate court cases, including *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 283 Ill. App. 3d 630 (1996), and *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277 (2009). In *Outboard Marine*, the insured manufacturing company sought a declaratory judgment that its CGL insurers had breached their duty to defend the company against suits filed by governmental agencies for water pollution. On remand from the supreme court (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992)), the appellate court affirmed the trial court's application of the time-on-the-risk approach application to assign a *pro rata* share to each excess insurer based on its finding of a continuous trigger. In doing so, the appellate court distinguished the holding in *Zurich* based on the fact that *Zurich* involved bodily injury and did not involve coverage for excess insurance. *Outboard Marine*, 283 Ill. App. 3d at 641. The court then considered and adopted the holding in *U.S. Gypsum*.

¶ 50 In *U.S. Gypsum*, the court addressed the issue of the appropriate trigger of coverage for asbestos property damage claims involving primary and excess insurance. The *Gypsum* court recognized that "bodily injury" and "property damage" are two distinct concepts which may require different characterizations of their respective coverage triggers. In adopting a continuous-trigger theory, the court found support from the *Zurich* decision and noted:

" 'Conceptually, the injury-in-fact trigger and the continuous trigger are on the same continuum and are complimentary, rather than mutually exclusive. Accordingly, courts have stated that "where injury-in-fact occurs continuously over a period covered by different insurers or policies, and actual apportionment of the

-14-

injury is difficult or impossible to determine, the continuous injury trigger may be employed to equitably apportion liability among insurers." ' *Gypsum*, 268 Ill. App. 3d at 644, quoting *Sentinel Insurance Co. v. First Insurance Co. of Hawai'i, Ltd.*, 76 Haw. 277, 300, 875 P.2d 894, 917 (1994).

We find the *Gypsum* court's rationale persuasive in applying the continuous-trigger theory and further find that the trial court correctly applied it to the facts of the instant case by finding that all of the policies were triggered and that the contamination of Waukegan Harbor amounted to a single continuing occurrence." *Outboard Marine*, 283 Ill. App. 3d at 641-42.

¶ 51    In *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277 (2009), Binney manufactured Crayola brand crayons. The packaging used said the crayons were "non-toxic." *Id*. at 280. A class action lawsuit was filed against Binney, alleging that there were "above trace-level" amounts of asbestos in the crayons. *Id*. The lawsuit sought as damages a small percentage of the purchase price of the crayons because of the false-labeling claim of nontoxicity. Binney filed a declaratory action against Federal, seeking indemnification under Federal's CGL policies which insured against advertising injury. The appellate court held that "[b]ecause Federal provided Binney advertising injury coverage during only 3 years of the approximately 30-year period at issue here," Federal should not be liable for more than approximately one-tenth of the total settlement under a *pro rata* time-on-the-risk formula. *Id.* at 295. In doing so, the court relied upon the holding in *AAA Disposal Systems, Inc. v. Aetna Casualty & Surety Co.*, 355 Ill. App. 3d 275 (2005), another excess insurance policy case involving property damage claims. The court noted that the holding in *Zurich* involved bodily injury and asserted that "[a] policy period limitation to coverage is exactly what was missing from the insurance contacts at issue in *Zurich*, allowing for the proper application of joint and several liability under the 'all sums' rule." *Federal Insurance*, 393 Ill. App. 3d at 292-93. As previously explained in this opinion (*supra* ¶ 46), the policies at issue in *Zurich* did contain language limiting coverage to injuries occurring during the policy periods.

¶ 52    Appellees strongly rely on the Second District's holding in *Missouri Pacific R.R. Co. v. International Insurance Co.*, 288 Ill. App. 3d 69 (1997). *Missouri Pacific* involved two questions certified by the trial court pursuant to Illinois Supreme Court Rule 308(a) (eff. Feb. 26, 2010). The case involved a declaratory action filed by the railroad against four of its excess CGL insurers. The underlying claims sought damages on behalf of thousands of railroad employees for hearing loss allegedly caused by continuous and repeated exposure to unsafe levels of noise. In addition, hundreds of employees brought claims against the railroad seeking damages for asbestos-related injuries allegedly caused by continuous and repeated exposure to unsafe levels of asbestos over many decades. *Missouri Pacific*, 288 Ill. App. 3d at 72.

¶ 53    The trial court certified two questions including:

" '1. Whether the "all sums" rule set forth by the Illinois Supreme Court in *Zurich Ins. Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23 (1987) or the pro-rata by time-on-the-risk theory articulated in *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, [283 Ill. App. 3d 630 (1996),] governs allocation of coverage where the Circuit Court has

found that noise-induced hearing loss claims constitute a single occurrence, and further has found that asbestos-exposure claims constitute a single occurrence ***.' " *Missouri Pacific*, 288 Ill. App. 3d at 74-75.

The Second District court answered this question as follows:

"We read nothing in *Zurich* as precluding the application of the *pro rata*, time-on-the-risk allocation method announced in *Outboard Marine* to the case at bar. *Zurich*'s rejection of a *pro rata* approach was based on the narrow facts of the case before it, namely, that it had rejected the trigger analysis set forth in *Forty-Eight Insulations*. The court did not adopt a general rule forever precluding the application of a *pro rata* approach. As we explained in *Outboard Marine*, such an approach is appropriate where, as here, a single continuous occurrence results in an unallocable loss implicating successive policy periods.

Our answer, then, to the first certified question is twofold. First, the parties should be given the opportunity to present evidence that NIHL [(hearing loss)] may (or may not) be measured and allocated, within a reasonable degree of medical and scientific certainty, to particular policy periods. IF NIHL cannot be allocated, then the court should apply the *pro rata*, time-on-the-risk allocation method adopted in *Outboard Marine*.

Finally, we add that the parties' arguments regarding the first certified question almost exclusively focused on the NIHL claims. Our consideration of the first question tracts this approach. However, our reasoning applies equally to the NIHL claims and asbestos-exposure claims." *Missouri Pacific*, 288 Ill. App. 3d at 79-80.

We note that the Second District in *Missouri Pacific* relied upon its own recent holding in *Outboard Marine*. As previously noted, *Outboard Marine* relied heavily upon the holding in *U.S. Gypsum*. The *U.S. Gypsum* court "recognize[d] that 'bodily injury' and 'property damage' are two distinct concepts which may require different characterizations of their coverage triggers." *U.S. Gypsum*, 268 Ill. App. 3d at 640. In addition to the language of *U.S. Gypsum* previously quoted in *Outboard Marine*, we find the following language particularly enlightening:

"Our decision is consistent with the basic principles announced in *Zurich* and *Wilkin*. The supreme court's use of a triple trigger in *Zurich* recognizes that multiple policy periods can be triggered by the evolving nature of an illness resulting from the exposure to asbestos. Similarly, our application of a continuous trigger recognizes that the property damage that results from the release of asbestos fibers and the reentrainment of asbestos fibers is a continuing process which necessarily occurs over multiple policy periods. The *Zurich* decision looks beyond the discrete event of the manifestation of the disease as the sole trigger. Similarly, the seductive appeal of a single discovery trigger must bow to the policy language as well as to the empirical realities and other general equitable considerations of reasonableness and fairness." *U.S. Gypsum*, 268 Ill. App. 3d at 646.

Although not all of the umbrella or excess policies at issue here contain the "all sums" language found in *Zurich*, they provide for payment of the amount of loss in excess of the loss payable by the underlying policies based on the language in the underlying primary policies which do contain the "all sums" language. As in the policies in *Zurich*, the parties

do no assert that any of the policies at issue permit *pro rata* application. The trial court below ruled, and defendants argue, that a *pro rata* allocation is warranted because the "during the policy period" language defines when there is an "occurrence" which implicates a specific policy or policies. However, the language "during the policy period" was also found in the policies in *Zurich* and our supreme court therein declined to order a *pro rata* allocation of liability. We adhere to our supreme court's decision in *Zurich* and hold that where coverage for asbestos-related injury claims is triggered by bodily injury or sickness or disease, all triggered policies are jointly and severally liable. In one of the appellees' petitions for rehearing, it is urged that our "jointly and severally liable" holding is a misplaced notion of tort liability that has "no place in the proper interpretation" of this insurance case. To the contrary, joint and several liability has been applied in numerous insurance cases and is most appropriate in this one. See *Sentinel Insurance Co. v. First Insurance Co. of Hawai'i, Ltd.*, 875 P.2d 894, 915 (Haw. 1994); *U.S. Gypsum*, 268 Ill. App. 3d at 644; *Benoy Motors Sales, Inc. v. Universal Underwriters Insurance Co.*, 287 Ill. App. 3d 942, 948 (1997). We do not conclude that all carriers are jointly and severally liable without regard to a particular policy period. Only those carriers providing policies for the period at issue will be liable. Only triggered policies are jointly and severally liable for all sums that the insured becomes legally obligated to pay as a result of asbestos bodily injury claims. Obviously, policies that are not triggered pay nothing. Uninsured periods are irrelevant as only carriers providing policies for the period at issue will be liable. There are no credits for uninsured years. Policies that are triggered pay "all sums" up to their limits. This determination is based on the contract law principle that it would be unfair to allocate the damages to an insurer "that did not agree to provide coverage during" a particular period of time. *AAA Disposal*, 355 Ill. App. 3d at 288 (citing *Outboard Marine*, 283 Ill. App. 3d at 642-44).

¶ 57                                    III. Exhaustion

¶ 58        Crane's final contention is that the trial court erred in finding that *Zurich* requires proof of all three triggers (exposure, sickness, and disease) in order to determine the exhaustion of policy limits. On cross-appeal, CNA argues that the trial court erred in determining that under *Zurich*, "bodily injury" occurs at the time of exposure. CNA also requests that this court revisit *Zurich* and find that no one can determine when injury first begins, and that an equitable continuous trigger over all dates between exposure and diagnosis or death should apply to prove exhaustion. Since these contentions all relate to *Zurich*'s trigger analysis, we will address them together. The trial court's interpretation of *Zurich* is a question of law we review *de novo*. *In re A.H.*, 207 Ill. 2d 590, 593 (2003).

¶ 59        As discussed above, *Zurich* specified three triggers for coverage for asbestos-related injuries: bodily injury, sickness, and disease. Bodily injury occurs upon exposure to asbestos. *Zurich*, 118 Ill. 2d at 45. Disease begins as of the date of diagnosis or death, and sickness is defined as ill-health, or when a person suffers from a weakened or unsound condition. *Id*. at 45-47. Since there was no consistent evidence in the record to show a progression of the disease between exposure and sickness, the supreme court in *Zurich* rejected the conclusion that injury occurred in that time period. *Id*. at 47. In the case before us, the trial court held a medical trial to determine whether medical technology and knowledge had advanced from

-17-

the time of *Zurich* to show injury during the period between exposure and sickness. It determined that medical knowledge had not advanced to the extent injury could be proven during that time period and concluded that the triple triggers of *Zurich* still applied. However, the trial court noted that our supreme court "did not clarify whether all the insured had to do was prove one of the three triggers." It concluded that the supreme court "intended for the insured to establish trigger dates" for all three triggers.

¶ 60     Although our supreme court did not clarify whether an insured had to prove all three triggers for coverage, it is clear from the wording in *Zurich* that the court did not intend such a result. Our supreme court stated that "[t]he circuit court and the appellate court correctly concluded that these terms must be read as separate and distinct triggers of coverage" and that "*each* of these events triggers coverage." (Emphasis added.) *Id*. at 44. The court then looked at each trigger, first concluding that bodily injury "occurs when asbestos fibers are inhaled and retained in the lung" and a policy in force at the time of a claimant's exposure "must provide coverage of that claim." *Id.* at 45. It further found that sickness or disease were "also" triggers for coverage. *Id.* at 45-46. Appellees argue that the trial court applied all three *Zurich* triggers only in determining whether all triggered primary policies had been exhausted. Appellees' argument fails as neither *Zurich* nor any other cited case requires an insured to prove the dates for all three possible triggers before they settle a claim which, as a consequence, reduces the amount of primary coverage that remains available before exhaustion. We conclude that *Zurich* does not require an insured to prove all three triggers for coverage and that coverage is triggered upon proof of exposure, sickness, or disease. A policy holder or primary insurer must show that all triggered primary policies are exhausted before any excess insurance policies can be required to respond to the claim. Exhaustion occurs when there are no other triggered primary policies available to cover the payments. *Kajima II*, 227 Ill. 2d at 114-15.

¶ 61     In its petition for rehearing, CNA argues that Crane has the burden to prove the specific dates on which the various policies at issue are triggered. While CNA appears to concede that the evidence proving some of those dates simply does not exist for every claim and that it might not be possible to pinpoint a date when an underlying plaintiff suffers from "sickness," it argues:

> "Obviously, if a claimant is injured by exposure to [Crane's] asbestos–as must be the case since all of the relevant underlying claims involved judgments against [Crane]–there *must* be a beginning and an end of exposure. There is no option. Likewise, if the claimant has a disease–as he must to recover a judgment–there *must* be a date of disease. Thus, these dates must be shown." (Emphasis in original.)

While some of these suppositions may arguably be true, CNA does not cite any evidence or any case law supporting them. For the reasons described above, we are not persuaded by and reject CNA's argument on this issue.

¶ 62                                    IV. Cross-Appeal
¶ 63                              A. Definition of Bodily Injury
¶ 64     On cross-appeal, CNA argues that the trial court erred in determining that under *Zurich*,

"bodily injury" occurs at the time of exposure. CNA contends *Zurich*'s finding that exposure to asbestos constitutes bodily injury is not one of law, but is a determination that must be made on a case-by-case basis. CNA argues that the parties in *Zurich* "conceded" that exposure results in bodily injury, but in this and other cases the event resulting in bodily injury is open to interpretation. CNA requests that this court revisit the issue and find, based upon new medical evidence, that "bodily injury" occurs with the first mutation that eventually results in cancer. It points to *Nolan v. Weil-McLain*, 233 Ill. 2d 416 (2009), as evidence that our supreme court has begun to question whether bodily injury occurs upon initial exposure to asbestos. However, our supreme court in *Nolan* did not revisit the issue of exposure as a trigger for asbestos-related injury as CNA claims. Rather, the issue in *Nolan* involved whether a claimant's bodily injury was proved by exposure to asbestos-containing products when evidence suggested the claimant was also exposed to asbestos from other sources. *Id*. at 419-20.

¶ 65       We decline CNA's request to revisit the issue because, as this court stated in *U.S. Gypsum*, this evidence of injury "has no bearing on the insurance coverage issue before us." (Internal quotation marks omitted.) *U.S. Gypsum*, 268 Ill. App. 3d at 623. The question before us is one of insurance coverage, not liability. "The challenge by the insurers in a coverage action may therefore not address the issue as to whether the underlying plaintiffs sustained damage for which the insured is liable. That was the subject of the underlying action. The coverage action may only address whether the damage in question falls within the coverage provisions of the policies." *Id*.

¶ 66       In *Zurich*, our supreme court noted that the evidence at trial showed that asbestos-related diseases "originate with the inhalation of asbestos fibers, and, the *continued inhalation* of asbestos causes additional injuries which eventually culminate in a disease." (Emphasis in original.) *Zurich*, 118 Ill. 2d at 47. The court concluded that bodily injury "takes place at or shortly after the time a claimant was exposed to asbestos and continues throughout a claimant's exposure to asbestos." *Id*. Furthermore, in summarizing its findings, our supreme court in *Zurich* concluded only that the triggers of disease and sickness "must be determined on a case-by-case basis." *Id*. at 47-48. We continue to follow *Zurich*'s holding that bodily injury occurs upon exposure to asbestos, and "an insurer that was on the risk during the time the claimant was exposed to asbestos must provide coverage." *Id*. at 47.

¶ 67                        B. Equitable Continuous Trigger

¶ 68       CNA also requests that this court revisit *Zurich* and find that no one can determine when injury first begins, and that an equitable continuous trigger over all dates between exposure and diagnosis or death should apply to prove exhaustion. A continuous trigger is useful in cases "where injury-in-fact occurs continuously over a period covered by different insurers or policies, and actual apportionment of the injury is difficult or impossible to determine." (Internal quotation marks omitted.) *Gypsum*, 268 Ill. App. 3d at 644.

¶ 69       Our supreme court in *Zurich* addressed this issue as it relates to asbestos-related personal injury. It found that, according to the expert testimony on record, there is no evidence that a claimant suffers continuous injury from the time of initial exposure to sickness or disease.

*Zurich*, 118 Ill. 2d at 47. Rather, the expert testimony revealed "that asbestos-related disease may or may not progress during periods of nonexposure" and "there are cases in which the disease progresses during periods of nonexposure and cases in which there is no progression." *Id*. Our supreme court found no continuing bodily injury from the time "exposure to asbestos ends and the time an asbestos-related disease becomes diagnosable." *Id*. at 46. No new evidence presented before the trial court below challenged this finding in *Zurich*. Once our supreme court has declared the law with respect to an issue, this court must follow that law, as only the supreme court has authority to overrule or modify its own decisions. *Mekertichian v. Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 836 (2004). We therefore decline CNA's invitation to revisit this issue.

¶ 70       Both sides on appeal also raised various evidentiary issues related to the exhaustion trial below. Due to our disposition of the case, we need not address those issues at the present time.

¶ 71       We remand the cause for determination of exhaustion based upon this opinion. On remand, pursuant to the "horizontal exhaustion doctrine," Crane must prove that all of the post-1986 primary insurance policies' original limits, without regard to the ACC, have been exhausted before the umbrella or excess coverage policies are implicated. Also, for claims of asbestos-related personal injury, all triggered excess or umbrella policies are jointly and severally liable for payment up to their limits. Finally, Crane need not prove all three of the triggers for coverage outlined in *Zurich*. Instead, coverage for asbestos-related personal injury claims is triggered upon proof of exposure, sickness, or disease. We reject CNA's request to use an equitable continuous trigger as our supreme court addressed this issue in *Zurich* and determined that personal injury from exposure to asbestos is not a continuous injury.

¶ 72       On remand, the trial court is to additionally consider any judgments and settlements paid by Crane and by Kemper since the last exhaustion trial.

¶ 73       Several of the insurer-appellees have also asked this court to grant a certification of importance under Illinois Supreme Court Rule 316 (Ill. S. Ct. R. 316 (eff. Dec. 6, 2006)), as part of their petition for rehearing, arguing: "It is no exaggeration to say that this Court's decision is more important than many of the cases granting Rule 316 certification [listing six appellate court decisions], as to the sheer number of claims and suits affected by this Court's determination of the issues on the merits." It is well settled that the appellate court's power to certify a case to the supreme court should be used very sparingly. *People v. Cherry Valley Public Library District*, 356 Ill. App. 3d 893, 900 (2005). Our supreme court is in a better position than this court to determine whether it should accept this case for further review. The request for certification pursuant to Rule 316 is therefore denied.

¶ 74       For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part and the cause remanded for a determination consistent with this opinion.

¶ 75       Affirmed in part and reversed in part; cause remanded with directions.